**Michael WALL, a minor, by his mother and next best friend, Laura WALL, Plaintiff,**

v.

**MATTITUCK–CUTCHOGUE SCHOOL DISTRICT, Defendant.**

No. 94 CV 4534.

United States District Court, E.D. New York.

Nov. 19, 1996.

Robert L. Schonfeld, Stein & Schonfeld, Garden City, NY, for Plaintiff.

Richard F. Lark, Cutchogue, NY, for Defendant.

## MEMORANDUM AND ORDER

BLOCK, District Judge.

Plaintiff, Laura Wall ("Wall"), brings this action on behalf of her son, Michael Wall ("Michael"), against Defendant, Mattituck–Cutchogue School District ("School District"), pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, seeking reimbursement for tuition expenses incurred during Michael's enrollment at a private residential school for dyslexic children. *See School Comm. of Burlington v. Department of Educ. of Mass.*, 471 U.S. 359, 369, 105 S.Ct. 1996, 2002, 85 L.Ed.2d 385 (1985) (holding that IDEA's grant of equitable authority empowers a court to order school authorities to reimburse parents for the cost of private special education). Presently before the Court is Wall's motion for summary judgment. For the reasons discussed below, the Court finds that the School District's special education program for Michael was appropriate. Accordingly, the Court denies Wall's motion, enters summary judgment in favor of the School District, and dismisses the complaint. Although this case is clear on the merits, the process for district court review of IDEA actions is conceptually quizzical, and thus, the Court endeavors to review and clarify this process.

## I. BACKGROUND

### A. Undisputed Facts

The following facts were stipulated to by the parties in a document entitled "Facts Agreed Upon By Parties." Michael was born on January 24, 1982. In 1991, he was classified as learning disabled after evaluation by the School District's Committee on Special Education ("CSE"). He was placed in a self-contained special education classroom for his third and fourth grades. At the end of the fourth grade, Michael's verbal and mathematical skills were tested. On the Woodcock Reading Mastery Test, he received a grade equivalent score of: 12.9 letter identification, 2.4 word identification, 2.9 word attack, 3.7 word comprehension, and 2.8 passage completion. In the mathematical area, on a wide-range achievement test, his scores placed at the fourth grade level.

In May 1993, on a Metropolitan Achievement Test, Michael received grade equivalent rankings of: 2.0 vocabulary, 2.1 work recognition, 1.8 total reading, 2.1 reading comprehension, 3.5 math concepts, 3.2 math problem solving, 3.7 math comprehension, 3.5 total math, 1.0 spelling, 3.3 language grammar, and 2.5 total language. Michael's private reading tutor, Ruth Nettleton ("Nettleton"), gave him a similar test on May 26, 1993. He scored grade equivalent rankings of 2.3 word identification, 1.5 word attack and 2.4 passage comprehension. On June 25, 1993, the Landmark School, a private school for learning disabled children, administered another Woodcock Reading Mastery Test. Michael scored grade equivalent rankings of 2.8 word identification and 1.6 word attack. During the summer of 1993, Michael attended a six-week summer course at the Landmark School. After the completion of this summer course, the Landmark School administered a further reading test. Michael scored grade equivalent rankings of 2.7 word identification and 2.4 word attack.

As a result of all these testings, several CSE meetings, Michael's past school performance, and his record of performance at the Landmark summer program, the CSE recommended, on August 12, 1993, that Michael be placed in the School District's fifth grade self-contained special education classroom during the 1993–94 school year for reading, social studies, spelling and math. The CSE recommended mainstreaming Michael in reg-

ular fifth grade classrooms for all other subjects—science, English, art, music, library, homeroom, and physical education.[1]

On August 16, 1993, a planning meeting was held by the School District. Among those in attendance were Patricia Beck ("Beck"), Michael's teacher in the special education classroom, Judith Finn ("Finn"), the School District's Director of Special Education, and Wall. At this meeting, the parties discussed Michael's proposed Individual Education Program ("IEP") for the upcoming 1993–94 school year.[2] Michael's mother received explanations pertaining to the proposed curriculum and texts to be utilized, a review of the make-up of the other students in the special education class, and procedures for parent-teacher communication during the school year. After the conference, Wall accepted Michael's IEP. Michael's placement in the special education classroom was subsequently approved by the School District's Board of Education.

Michael commenced the fifth grade on September 8, 1993 in the School District's East Cutchogue school building, which contained all of the School District's fifth and sixth grade students. During the first week of school, Beck performed various informal classroom tests on Michael. The results of Michael's testing reflected his learning difficulties, particularly in reading and math. Beck tailored Michael's instruction based on these results.

During the academic school day there were anywhere from two to eight children in the special education classroom with Beck and a teaching assistant. Michael would receive his math, reading and spelling instruction from Beck. Much of the teaching was individualized, employing a one-on-one method. The reading instruction included concentration on spelling, punctuation, capitalization and decoding skills.

On September 27, 1993, Wall met with Beck, Peggy Dickerson ("Dickerson"), Michael's regular fifth grade classroom teacher, and Finn. The meeting concerned Michael's apparent difficulties with his English studies. Beck and Finn recommended that Michael no longer be mainstreamed in English, and Wall shortly thereafter concurred. On October 25, 1993, a parent-teacher conference was held between Wall, Beck, Dickerson, Finn and James Gilvarry ("Gilvarry"), the principal of Michael's school. At this meeting, Wall expressed her displeasure with several physical classroom occurrences between Michael and another special education student. The meeting was adjourned, at Wall's request, to allow Michael to be psychologically evaluated.

On December 2, 1993, a parent-teacher conference was held with Beck, Michael, and his mother. The main topics concerned Michael's unhappiness at school, his school performance, and procedures for completing homework. Further, Beck stated her intention to recommend that Michael be mainstreamed in social studies following the Christmas recess.

On January 3, 1994, Wall notified Beck of her displeasure with the special education program. In particular, she referred to an incident that took place over the Christmas vacation when two students in the special education class had telephoned Michael and teased him about his stuttering. Beck informed Wall that since this occurrence happened outside of school, she could not do anything about it. In turn, Wall informed both Beck and Gilvarry that she was removing Michael from the school. She thereafter enrolled Michael in the Landmark School and, subsequently, on January 13, 1994, requested a hearing before an impartial hear-

---

1. "Mainstreaming" refers to the integration of children enrolled in special education classes into the general school environment. *Manuel R. v. Ambach*, 635 F.Supp. 791, 794 (E.D.N.Y.1986) (Nickerson, J.); *see Oberti v. Board of Educ.*, 995 F.2d 1204, 1206 n. 1 (3rd Cir.1993) ("Integrating children with disabilities in regular classrooms is commonly known as 'mainstreaming.' "); 20 U.S.C. § 1412(5)(B).

2. The IEP is a written statement that sets forth, *inter alia*, the child's present performance level, goals, specific services that will enable the child to meet those goals, and evaluation criteria and procedures. 20 U.S.C. § 1401(a)(20); *see Hope v. Cortines*, 872 F.Supp. 14, 16 (E.D.N.Y.) (Block, J.), *aff'd*, 69 F.3d 687 (2d Cir.1995).

ing officer.[3] The hearing commenced on March 10, 1994.

## B.  Evidence Presented at the Hearing

At the hearing, Wall did not challenge the appropriateness of the IEP. Instead, she asserted that the School District had improperly implemented the IEP by failing to use a specific reading instruction approach, the Orton–Gillingham method.[4] Wall also argued that the School District failed to group Michael in a class with children having similar abilities and needs, as required by the Commissioner of the New York Department of Education's regulations.[5] The hearing spanned from March 10, 1994 to May 25, 1994, producing 1761 pages of minutes and forty-eight exhibits. Testimony was received from several persons, including Beck, the School District's psychologist Dr. Michael Cardillo, child psychologist Dr. Robert T. Matuozzi, Dickerson, Landmark School public liaison Karl Pulkkinen ("Pulkkinen"), and Wall.

With regard to the grouping issue, testimony was presented pertaining to Michael's needs in relation to the needs of the other children in his special education class. Beck was questioned extensively about the learning disorders, levels of academic achievement, physical development, and management needs of each child. She testified that although Michael had the lowest scores in reading, he was at the top of his class in other areas. There was also testimony confirming isolated incidents of antagonism and occasional physical conflict between Michael and another student in his special education class.

With regard to the adequacy of Michael's instruction, Wall contended that the School District should have consistently used the Orton–Gillingham method of reading instruction. She presented several witnesses who extolled the virtues of Orton–Gillingham. Specifically, Charles Richardson ("Richardson"), a self-employed educational consultant, testified that Orton–Gillingham was the only effective strategy to teach reading to children with Michael's impediments. However, Richardson had never taught in a special education setting and, furthermore, was not a certified teacher. Pulkkinen also criticized Beck's approach. However, he too was not qualified as a special education or reading teacher, and was not trained in the Orton–Gillingham method. Wall also presented the testimony of Michael's private tutor, Nettleton, who criticized Beck for not using the Orton–Gillingham method. However, on cross-examination, Nettleton admitted that Orton–Gillingham was not the only method that could achieve positive results.

Beck testified that she held a Master's Degree in Special Education, had twenty-four credit hours beyond the Master's level, and was certified in Orton–Gillingham. She testified that she used Orton–Gillingham with Michael on occasion, but did not believe it was necessary to do so exclusively. The School District elicited testimony from several witnesses, including Richardson and Nettleton, that no school in Long Island provided a decoding skills program based solely on Orton–Gillingham.

## C.  The Administrative Determinations

In a decision dated July 8, 1994, the hearing officer held that Michael had been ap-

---

3.  IDEA allows parents to enforce their rights under the statute in a hearing before an impartial hearing officer. 20 U.S.C. § 1415(b)(2). It also provides for a party aggrieved by the findings of the hearing officer to seek independent review by the highest state educational agency. 20 U.S.C. § 1415(c). In accordance with IDEA's mandate, see 20 U.S.C. § 1415(a), New York State has implemented the federal scheme. N.Y.Educ.Law §§ 4404(1), 4404(2) (McKinney 1995). This review is conducted by a state review officer of the New York State Department of Education ("State Review Officer"). N.Y.Educ. Law § 4404(2).

4.  The Orton–Gillingham approach is a linguistic-phonetic approach with an emphasis on teaching the student to learn how to decode words.

5.  8 N.Y.C.R.R. § 200.6(3) requires students with disabilities to be grouped by similarity of individual needs. Essentially, this regulation requires that: (1) students share a similar range of academic or educational achievement; (2) the social development of each student be considered prior to placement in an instructional group; (3) the students' physical needs be considered prior to placement in an instructional group; and (4) the opportunities of other students to benefit from instruction are not consistently diminished by the presence of any one student.

propriately grouped with children of similar requirements and abilities and that Beck's instructional techniques had satisfied Michael's special educational needs. In that regard, the hearing officer specifically found that Beck's decision not to exclusively rely on the Orton–Gillingham method was appropriate and, moreover, was in keeping with the practices of other schools. Wall appealed the hearing officer's decision to a State Review Officer. By decision dated September 9, 1994, the State Review Officer dismissed Wall's appeal, concluding that the School District had "met its burden of proving that it provided [Michael] with an appropriate instructional program." Wall then brought this action.

## D. Evidence Presented to the Court

Wall raises before this Court the same objections to Michael's educational program that she raised before the State Review Officer. Specifically, she argues that: (1) Michael was not appropriately grouped with children of similar needs in the special education classroom; and (2) the School District's instructional program was not appropriate because it failed to provide adequate reading instruction.

The parties, as is their right under IDEA, have submitted additional evidence. 20 U.S.C. § 1415(e)(2). Wall has submitted a sworn affidavit by Pulkkinen. The affidavit addresses the program offered at the Landmark School and reiterates Michael's scores from the June 1993 and August 1993 reading diagnostic tests administered by the Landmark School. This evidence is similar to evidence presented at the hearing. In support of its contention that Michael was appropriately grouped, the School District has submitted a profile of Michael's special education classmates. It contains grade equivalent rankings for each student in math and reading, and evaluates each of them as to social development skills, physical characteristics and management needs.

## II. DISCUSSION

IDEA provides, in pertinent part, that a claimant may bring an action "in any State court of competent jurisdiction or in a dis-

trict court of the United States." 20 U.S.C. § 1415(e)(2). It further provides that a court "shall receive the records of the administrative proceedings, shall hear the additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." *Id.* "In reviewing whether a proposed program is appropriate, a court must determine whether the state has 'complied with the procedures set forth in the Act' and whether 'the individualized education program ... [is] reasonably calculated to enable the child to receive educational benefits." *Briggs v. Board of Educ.*, 882 F.2d 688, 691–92 (2d Cir.1989) (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206–07, 102 S.Ct. 3034, 3051, 73 L.Ed.2d 690 (1982)).

In implementing IDEA's overarching goal of providing a "free and appropriate education," states must establish "procedures to assure that, to the maximum extent appropriate, handicapped children ... are educated with children who are not handicapped." 20 U.S.C. § 1412(5)(B). As the Court of Appeals for the Ninth Circuit noted, "[t]he language of the IDEA ... clearly indicates a strong preference for 'mainstreaming,' i.e., educating handicapped children alongside non-handicapped children in a regular educational environment." *Poolaw v. Bishop*, 67 F.3d 830, 834 (9th Cir.1995); *see Briggs*, 882 F.2d at 692 (IDEA indicates strong preference for mainstreaming); *Salley v. St. Tammany Parish Sch. Bd.*, 57 F.3d 458, 467 (5th Cir.1995) (same). The preference for mainstreaming is intended to allow the education of handicapped children in the least restrictive environment possible. *Poolaw*, 67 F.3d at 834; 34 C.F.R. § 300.550 *et seq.* However, IDEA's preference for mainstreaming must yield, where necessary, to the requirements of an individual child's handicap. *Briggs*, 882 F.2d at 692 ("where the nature or severity of the handicap is such that education in regular classes cannot be achieved satisfactorily, mainstreaming is inappropriate."); *Poolaw*, 67 F.3d at 834.

In *Rowley*, the Supreme Court admonished that "courts must be careful to avoid imposing their view of preferable edu-

cational methods upon the States." *Rowley,* 458 U.S. at 207, 102 S.Ct. at 3051. It explained that the preponderance of the evidence standard was "by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities" and, accordingly, it directed courts to give "due weight" to the results of the administrative process and temper their review with deference to school agencies' expertise. *Id.* at 205–06, 102 S.Ct. at 3050–51; *see also Briggs,* 882 F.2d at 693 ("Deference is owed to state and local agencies having expertise in the formulation of educational programs for the handicapped."). The amount of weight given to the administrative proceedings is subject to the court's exercise of informed discretion and should be based, in part, on the thoroughness of the administrative findings. *See Capistrano Unified Sch. Dist. v. Wartenberg,* 59 F.3d 884, 891 (9th Cir.1995); *Lenn v. Portland Sch. Comm.,* 998 F.2d 1083, 1087 (1st Cir. 1993).

## A. The Process of IDEA Review in the District Court

■ Neither *Rowley,* nor any Second Circuit case, nor the Federal Rules of Civil Procedure, nor IDEA addresses the process which district courts should employ in an IDEA federal court action. The courts that have addressed the issue have recognized the paradoxical position of the district court as both an independent fact finder and a judicial body bound to review and give deference to the findings of an administrative agency. As one district court succinctly recognized:

> The statutory directives to consider additional evidence and to decide on the preponderance of the evidence take the court's role well beyond the more familiar standards for judicial review of administrative adjudications. At the same time, the court does not hear the case *de novo,* erasing the blackboard and hearing all evidence as if for the first time.

*D.F. v. Western Sch. Corp.,* 921 F.Supp. 559, 564 (S.D.Ind.1996); *see also Murray v. Montrose County Sch. Dist.,* 51 F.3d 921, 927 (10th Cir.1993) ("[T]he court does not use the substantial evidence standard typically ap-

plied in the review of administrative agency decisions, 'but instead must decide independently whether the requirements of the IDEA are met.' ") (citation omitted), *cert. denied,* —— U.S. ——, 116 S.Ct. 278, 133 L.Ed.2d 198 (1995). There is a range of expressions that circuit courts have used regarding the standard of review. *See Murray,* 51 F.3d at 927 ("[The standard] has been described as a 'modified *de novo* review,' or as 'involved oversight.' ") (citations omitted); *Teague Indep. Sch. Dist. v. Todd L.,* 999 F.2d 127, 131 (5th Cir.1993) ("In explicitly adopting the view that the district court's review of the hearing officer's decision is virtually *de novo,* we join the First, Seventh, Ninth and Eleventh Circuits."); *Lenn,* 998 F.2d at 1086 (IDEA "contemplates an intermediate standard of review ... which, because it is characterized by independence of judgment, requires a more critical appraisal of the agency determination than clear-error review entails, but which nevertheless, falls well short of complete *de novo* review.").

The Ninth Circuit recently articulated an intelligent resolution of the "puzzling procedural problem" presented whenever a district court is called upon to adjudicate an IDEA action. *Capistrano,* 59 F.3d at 892. After noting the unique nature of the adjudicatory responsibilities of federal district courts in IDEA actions and the frequent practice of presenting these actions to district courts via the summary judgment provisions of Rule 56, it concluded that:

> It is hard to see what else the district court could do as a practical matter under [IDEA] except read the administrative record, consider the new evidence, and make an independent judgment based on a preponderance of evidence and giving due weight to the hearing officer's determinations. The district court's independent judgment is not controlled by the hearing officer's recommendations, but neither may it be made without due deference. Because this appears to be what Congress intended under [IDEA] ... it is the right thing to do, even though it does not fit well into any pigeonhole of the Federal Rules of Civil Procedure. Though the parties may call the procedure a "motion for summary

judgment" in order to obtain a calender date from the district court's case management clerk, the procedure is in substance an appeal from an administrative determination, not a summary judgment.

*Id.*

■ The Court, therefore, is not dealing with summary judgment in its traditional setting. Nonetheless, summary judgment appears to be the most pragmatic procedural mechanism in the Federal Rules for resolving IDEA actions where, as here, in addition to the record at the administrative level, "additional evidence" is submitted to the court.[6] The inquiry, however, is not directed to discerning whether there are disputed issues of fact, but rather, whether the administrative record, together with any additional evidence, establishes that there has been compliance with IDEA's processes and that the child's educational needs have been appropriately addressed. It matters not, in this context, who initiates the motion.[7]

Curiously, the paradoxical nature of federal district court review of IDEA cases has been obviated by the New York State Legislature where review is sought in the State forum because the Legislature has provided that State review be made pursuant to Article 78 of the State's civil practice rules. *See* N.Y.Educ.Law § 4404(3) (McKinney 1995). The State courts have therefore applied the substantial evidence rule pursuant to N.Y.Civil Practice § 7803. *See Adler v. Education Dep't,* 760 F.2d 454, 456–58 (2d Cir. 1985); *see, e.g., Board of Educ. of Baldwin v. Sobol,* 160 Misc.2d 539, 545, 610 N.Y.S.2d 426, 429 (Sup.Ct.Nassau County 1994) ("The record before the State Review Officer supports the determination rendered; and since there is a rational basis therefor, this court will not interfere therewith ... [a]s such decision was not arbitrary or capricious nor based on error of law[.]"). While the four month Article 78 statute of limitations may be an appropriate analogue for federal statute of limitations purposes, *see Adler,* 760 F.2d at 454, judicial review under the substantial evidence standard is a far cry from the independent preponderance of the evidence judicial review explicitly provided by IDEA. *See Rowley,* 458 U.S. at 205, 102 S.Ct. at 3050 ("In substituting the current language of the statute for language that would have made state administrative findings conclusive if supported by substantial evidence, the Conference Committee explained that courts were to make 'independent decision[s] based on a preponderance of the evidence.' ") (citation omitted). No court has yet addressed the issue of whether the New York statutory scheme substantively clashes with Congress' design to carve out an independent fact finding role for the courts, regardless of whether review is sought on the state or federal level.[8]

**6.** If the parties do not request that the court review additional evidence, they could appropriately employ the procedural mechanism of judgment on the pleadings. *See, e.g., Fuhrmann v. East Hanover Bd. of Educ.,* 993 F.2d 1031, 1035 n. 3 (3rd Cir.1993) (resolving an IDEA action as if the parties had moved for judgment on the pleadings) ("The parties have not requested that the court consider additional evidence, so the court's determination will be based on the record of the administrative proceedings."). In that situation, review would be procedurally akin to the common practice in Social Security appeals, *see* 42 U.S.C. § 405(g), in which the Commissioner of Social Security submits the administrative record as part of her answer and the parties move thereafter for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).

**7.** Even if the Court were dealing with the conventional summary judgment scenario, it is well-settled that courts have the power to grant summary judgment *sua sponte* in favor of a non-

moving party provided the opposing party has had a full and fair opportunity to challenge the non-moving party's entitlement to summary judgment. *See Ramsey v. Coughlin,* 94 F.3d 71, 73–74 (2d Cir.1996) (citing 6 James Wm. Moore, *Moore's Federal Practice* ¶ 56.12, at 56–165 (2d ed. 1995)).

**8.** Because this action was brought in federal court, the Court need not address whether the Article 78 standard of review would be pre-empted by the Supremacy Clause. However, there is case law in the IDEA context which supports this possibility. *See generally Hacienda La Puente Sch. Dist. of L.A. v. Honig,* 976 F.2d 487, 495 (9th Cir.1992) (applying Supremacy Clause to award of attorney's fees in action brought pursuant to 20 U.S.C. § 1415(e)(2)); *see also In re Conklin,* 946 F.2d 306, 308 (4th Cir.1991) (states to qualify for federal funding under IDEA may not do less than it commands although they may do more).

Adhering to its understanding of the procedural purport of IDEA and Congress' underlying intent to meld the educational agency's determination with an informed independent judicial judgment, the Court has, accordingly, read the administrative record, considered the new evidence, and made an independent judgment based on a preponderance of evidence, giving due weight to the administrative proceedings. Before proceeding to evaluate the merits of the case, however, the Court considers which party bears the burden of proof in an IDEA judicial action.

## B.  The Burden of Proof

■ The rule generally followed by the circuits that have addressed this issue is that the burden of proof should be placed on the party challenging the administrative ruling. *See, e.g., Burlington v. Department of Educ. for Mass.,* 736 F.2d 773, 794 (1st Cir.1984), *aff'd,* 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985); *Barnett v. Fairfax County Sch. Bd.,* 927 F.2d 146, 152 (4th Cir.), *cert. denied,* 502 U.S. 859, 112 S.Ct. 175, 116 L.Ed.2d 138 (1991); *Tatro v. State of Texas,* 703 F.2d 823, 830 (5th Cir.1983), *aff'd in part and rev'd in part on other grounds sub nom. Irving Indep. Sch. Dist. v. Tatro,* 468 U.S. 883, 104 S.Ct. 3371, 82 L.Ed.2d 664 (1984); *Doe v. Board of Educ. of Tullahoma City Schs.,* 9 F.3d 455, 458 (6th Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 2104, 128 L.Ed.2d 665 (1994); *Board of Educ. v. Illinois State Bd. of Educ.,* 41 F.3d 1162, 1167 (7th Cir.1994); *Clyde K. v. Puyallup Sch. Dist. No. 3,* 35 F.3d 1396, 1399 (9th Cir.1994); *Kerkam v. McKenzie,* 862 F.2d 884, 887 (D.C.Cir.1988).[9] However, the Third Circuit has held otherwise, *see Carlisle Area Sch. v. Scott P.,* 62 F.3d 520, 532 (3rd Cir.1995), *cert. denied,* — U.S. —, 116 S.Ct. 1419, 134 L.Ed.2d 544 (1996); *Oberti v. Board of Educ.,* 995 F.2d 1204, 1219 (3rd Cir.1993),

and there is a split in the district courts of the Second Circuit. *Compare Evans v. Board of Educ.,* 930 F.Supp. 83, 92 (S.D.N.Y. 1996) (holding that the party challenging the administrative determination has the burden of proof), *and Hiller v. Board of Educ.,* 743 F.Supp. 958, 967 (N.D.N.Y.1990) (same), *with Mavis v. Sobol,* 839 F.Supp. 968, 985 (N.D.N.Y.1994) (placing the burden of proof on the school district even though it had prevailed at the administrative level).

The Second Circuit has never directly addressed the issue. The Court is cognizant, however, that the Second Circuit, in reviewing its reasons for reversing a district court's determination of an IDEA appeal, has stated: "[N]either the court nor the [parents] pointed out anything in the administrative record to substantiate the claim that [the child's] needs could be met in a less segregated setting." *Briggs,* 882 F.2d at 692. This Court, however, does not perceive this passing statement in *Briggs* to be controlling on the burden issue. As Judge McCurn noted in *Mavis,* the issue was not clearly before the Second Circuit:

> Rather, the primary focus of the Court's inquiry in *Briggs* was whether the district court gave sufficient deference to the agency experts and hearing officer.... [T]he issue of which party bears the burden of proof ... is quite different from the district court's obligation to afford due weight to administrative proceedings.

*Mavis,* 839 F.Supp. at 985 (citation omitted).[10]

Three main arguments have been advanced in support of placing the burden of proof on the party challenging the administrative determination. First, courts have reasoned that the "deference due the decision of the underlying state administrative process requires that the party challenging the administrative decision bear the burden

---

9. This rule applies whether it is the school district or the child who challenges the administrative determination. *Compare Gerstmyer v. Howard County Pub. Schs.,* 850 F.Supp. 361, 364 (D.Md.1994) ("The burden of proof rests on the Gerstmyers who are challenging the state administrative decision.") *with Seattle Sch. Dist., No. 1 v. B.S.,* 82 F.3d 1493, 1498 (9th Cir.1996) ("As the party challenging the administrative ruling,

the School District ... had the burden of proof in district court.").

10. The Court notes that the two district court cases in the Second Circuit that have followed the general rule neither cited nor relied upon *Briggs. See Evans,* 930 F.Supp. at 92; *Hiller,* 743 F.Supp. at 967.

of proof." *Tice v. Botetourt County Sch. Bd.*, 908 F.2d 1200, 1206 n. 5 (4th Cir.1990). Second, since the IEP is jointly developed by a school district and the parents, courts have held that "fairness requires that the party attacking its terms should bear the burden of showing why the educational setting established by the IEP is not appropriate." *Tatro*, 703 F.2d at 830; *see also Independent Sch. Dist. No. 283 v. S.D.*, Civ. No. 3–93–662, 1995 WL 875463, at *11 n. 30 (D.Minn. March 13, 1995) (listing cases), *report and recommendation adopted by* 1995 WL 874283 (D.Minn. May 11, 1995), *aff'd*, 88 F.3d 556 (8th Cir.1996). Third, courts have argued that where the statutory language is unclear, the burden of proof should be allocated pursuant to neutral principles independent of any particular statute's policy objectives, and that those principles place the burden on the challenging party. *Clyde K.*, 35 F.3d at 1399 ("Allocation of the burden of proof has long been governed by the rule that the party bringing the lawsuit must persuade the court to grant the requested relief.").

In rejecting the general rule, the Third Circuit presented several arguments in support of placing the burden of proof on the school district. First, the court focused on IDEA's directive that district courts make an independent determination:

Given that the district court must independently review the evidence adduced at the administrative proceedings and can receive new evidence, we see no reason to shift the ultimate burden of proof to the party who happened to have lost before the state agency, especially since the loss at the administrative level may have been due to incomplete or insufficient evidence or to an incorrect application of [IDEA].

*Oberti*, 995 F.2d at 1219. Second, the court rejected the notion that IDEA's requirement that "due weight" be given to administrative proceedings equates to placing the burden on the party challenging the administrative determination:

The purpose of the "due weight" obligation is to prevent the court from imposing its own view of preferable educational methods on the states. [ (citation omitted).]

Accordingly, the due weight is owed to the administrative proceedings, not to the party who happened to prevail in those proceedings. The district court can give due weight to the agency proceedings (i.e., refrain from imposing its own notions of educational policy on the states), while the ultimate burden of proof remains on the school.

*Id.* Third, the court focused on the underlying purpose of IDEA and its inherent incompatibility with the general rule:

Underlying [IDEA] is "an abiding concern for the welfare of handicapped children and their parents." (citations omitted). Requiring parents to prove at the district court level that the school has failed to comply with [IDEA] would undermine [its] express purpose "to assure that the rights of children with disabilities and their parents are protected," 20 U.S.C. § 1400(c), and would diminish the effect of the provision that enables parents and guardians to obtain judicial enforcement of [IDEA's] substantive and procedural requirements, *see* 20 U.S.C. § 1415(e). In practical terms, the school has an advantage when a dispute arises under [IDEA]: the school has better access to the relevant information, greater control over the potentially more persuasive witnesses (those who have been directly involved with the child's education), and greater overall educational expertise than the parents.

*Id.; see also Lascari v. Board of Educ.*, 116 N.J. 30, 45, 560 A.2d 1180, 1188 (1989) (holding that the burden should be on the school district and stating that "[o]ur result is also consistent with the proposition that the burdens of persuasion and of production should be placed on the party better able to meet those burdens.").

In addition to the arguments laid out by the Third Circuit in *Oberti*, the New Jersey Supreme Court, in *Lascari*, focused on the nature of the proceedings, and their less than adversarial nature, in support of placing the burden on the school district:

Although the posture of the [school] district [when it wins at the administrative level] is that of a defendant [in the judicial proceedings], the nature of the proceed-

ings suggests that it is not asking too much to require it to carry the burden of proof. These matters are initiated as administrative proceedings and reviewed by a court sitting without a jury. Consequently, the allocation of the burden of proof may not be as important to trial strategy as it would be in other proceedings, such as a jury trial. Furthermore, both the parents and the district have an interest in assuring that a handicapped child receives an appropriate education. In that setting, the adversary nature of the proceedings should yield to obtaining the right result for the handicapped child. Thus, the distinction between the burden of proof and the burden of production may be less critical than it would be in another context.

*Lascari,* 116 N.J. at 45–46, 560 A.2d at 1188.

The first point made by the Third Circuit, noting the independent nature of the district court's review, is of compelling conceptual significance. Because the district court retains a fact-finding role, there is a continuum from the proceedings at the administrative level to the review in the district court. This continuum counsels in favor of retaining the same burden of proof at both levels. *See* Dixie Snow Huefner, *Judicial Review of the Special Educational Program Requirements Under the Education for all Handicapped Children Act: Where Have We Been and Where Should We Be Going?,* 14 *Harv.J.L.* & *Pub.Pol'y* 483, 512 (1991) (criticizing courts for their failure to pay sufficient attention to the burden of proof at the administrative level).

It has consistently been held that the burden throughout the administrative process is placed upon the school district. *See Carlisle,* 62 F.3d at 533 ("In administrative ... proceedings, the school district bears the burden of proving the appropriateness of the IEP it has proposed."); *Clyde K.,* 35 F.3d at 1398 ("The school clearly had the burden of proving at the administrative hearing that it complied with the IDEA."); *Hiller,* 743 F.Supp. at 967 n. 43 (listing New York cases which stand for the proposition that "a school district has the burden of proving the appropriateness of its placement and programs con-

cerning a handicapped child before both the hearing officer and the Commissioner."). This is in obvious recognition of the school's overarching obligation to attend to the specific educational needs of children with disabilities. *See* S.Rep. No. 94–168 to P.L. 94–142, at 9, *reprinted in* 1975 U.S.C.C.A.N. 1425, 1433 ("It is this Committee's belief that the Congress must take a more active role under its responsibility for equal protection of the laws to guarantee that handicapped children are provided equal educational opportunity."). Coupling this obligation with the independent fact-finding responsibilities of the district court, the Court concludes that the burden should not be shifted at the district court level. This is simply in keeping with IDEA's special sensitivity to the needs of the nation's special children.

## C. The Merits

■ Despite the unresolved issue in the Second Circuit as to the burden of proof in IDEA actions, here the record is clear regardless of who should be deemed to bear the burden. Of course, Wall can hardly complain if the burden is placed on the School District. The Court determines, after giving due weight to the administrative proceedings, that the School District has established by a preponderance of the evidence that Michael was adequately grouped with children possessing similar requirements and that his IEP was reasonably calculated and implemented to produce educational benefits.

As to Michael's grouping, his abilities were well within the range of other students. The attention he received through his specialized instruction in Beck's classroom and through mainstreaming in Dickerson's regular classroom provided him with the least restrictive environment in accordance with IDEA's express preference for mainstreaming, and did not negatively affect the needs of his classmates. Although Michael had some altercations with another student in his special education class, these alone are not sufficient under all the circumstances of this case to render the grouping inappropriate.

As to the IEP, it was reasonably calculated to and was in fact producing educational benefits. Michael's test scores show that he

was making progress in several areas of study, including reading, prior to his removal from the School District. The record clearly establishes that his teachers were deeply concerned in and involved with his progress. Although Beck's instructional technique, specifically the absence of exclusive reliance on the Orton–Gillingham method, may not have met Wall's exact desires, accommodating a parent's ideal educational program is beyond the scope of IDEA.

## III. CONCLUSION

For the foregoing reasons, Wall's motion for summary judgment is denied and summary judgment is granted in favor of the School District.[11] Accordingly, the complaint is dismissed.

**SO ORDERED.**

---

11. Once the merits of an IDEA case are brought to a court's attention by a party's invocation of a procedural device such as summary judgment, it is questionable whether there is any reason for the opposing party to cross-move. The only concern a court should have in entering judgment for either side in an IDEA action is whether the parties have been given an adequate opportunity to submit additional evidence and make the arguments they believe support their respective positions. Here, the parties submitted the administrative record, stipulated facts, additional written evidence, and legal memoranda. Accordingly, the entry of summary judgment for defendants was appropriate even without a formal cross-motion.