William and Lisa DAVIS, parents of a disabled student, C.R., Plaintiffs,

v.

WAPPINGERS CENTRAL SCHOOL DISTRICT, Defendant.

No. 7:06–cv–6059 (WWE).

United States District Court, S.D. New York.

Feb. 12, 2010.

Rosalee Charpentier, The Law Office of Salamon Davis, New York, NY, for Plaintiffs.

James P. Drohan, Donoghue, Thomas, Auslander & Drohan, Hopewell Junction, NY, for Defendant.

### MEMORANDUM OF DECISION ON CROSS MOTIONS FOR SUMMARY JUDGMENT

WARREN W. EGINTON, Senior District Judge.

This action raises the question of when a school district must reimburse the parents of a special education student for a unilateral private school placement under the Individual with Disabilities in Education Act ("IDEA"). Now pending before the Court are the parties' cross motions for summary judgment. Plaintiffs challenge the conclusion of the State Review Officer ("SRO") that they are not entitled to reimbursement for tuition spent on their son at a private school (Doc. # 6). By its response to plaintiffs' motion for summary judgment, defendant cross-moves for summary judgment, challenging the SRO's ruling that C.R.'s Individualized Education Plan ("IEP") was insufficient (Doc. # 7).

The Court has jurisdiction over plaintiff's claims pursuant to 28 U.S.C. § 1331.

## BACKGROUND

The parties have submitted briefs, a stipulation of facts [1] and supporting exhibits which reflect the following factual background. In addition, to the extent that they are relevant and undisputed, the Court has taken several facts from Judge Robinson's decision on summary judgment in plaintiffs' previous case. *See Davis v. Wappingers Central School District,* No. 7:04–cv–2969 (SCR) (S.D.N.Y. Oct. 2, 2006).

### I. Factual Background

Plaintiffs William and Lisa Davis are the parents of a disabled student, C.R.[2] C.R. was born in October 1990 and is classified as learning disabled. C.R. was initially suspected of having language-based disabilities during his first year of public school in 1995–96 and was referred to defendant Wappingers Central School District's Committee on Special Education ("CSE"). At that time, he was classified as Speech and Language Impaired and was provided speech-language therapy in first, second and third grades.

In 1996–97, C.R. entered the first grade at defendant's school, where he experienced difficulty in reading and was provided with small group instruction with a state-certified reading teacher. In June 1998, defendant decided not to promote C.R. to the second grade. Instead, C.R.

remained in the first grade. During second and third grades, C.R. continued in the district's reading and writing programs.[3]

In 2004–05, C.R. was in eighth grade at the Kildonan School, a private school. Ten days prior to the start of the school year, plaintiffs informed the district of their objection to the lack of an IEP. No IEP was in place for C.R. until September 14, 2004, one-and-a-half weeks into the school year. The only explanation excusing the district's tardiness relating to the IEP was the fact that C.R. was no longer at defendant's school.

On May 20, 2004, an annual review meeting was held with CSE chairperson Paul Brenner, School Psychologist Will Siegel and the Kildonan School's Academic Dean, Dr. Robert A. Lane. In addition, there was a parent representative and two teacher representatives. There was no speech therapist present. The parties disagree as to whether anyone present could explain the results of the relevant tests that C.R. had taken. The CSE was unable to develop goals and objectives before the meeting finished.

The district sent notice of the continued CSE meeting to C.R.'s parents on July 26, 2004, and it was held on August 9. At this meeting, there was no representative from Kildonan. At the end of the meeting, no conclusion had been made as to C.R.'s recommended placement. The notice of placement provided to plaintiffs following

---

1. To the extent that the parties' respective counter-statements of fact do not comply with Local Civil R. 56.1(c), the Court will consider the relevant statements deemed admitted. The Court, however, will not review any factual assertion that is not supported by citations to exhibits in evidence. Local Civil R. 56.1(d).

2. In plaintiffs' statement of fact and their memorandum of law in support of summary judgment, plaintiffs refer to their son as

"C.D." The case caption of the complaint referred to the son as "Christopher R." Further, the papers' captions since have referred him as "C.R." For the sake of uniformity, the Court will refer to him as "C.R."

3. The Court will not address the intermediary years of C.R.'s time in school because they are not relevant to the instant issues. They are addressed in Judge Robinson's October 2, 2006 opinion.

the meeting stated that there would be a district placement and that it had yet to be determined; the placement was going to be "possibly 12:1:1 SC or 12:1 integrated." Plaintiffs left the meeting understanding that more information would be needed to determine the placement. Specifically, plaintiffs had requested information about the proposed self-contained classes prior to the start of school. The participants did not discuss or develop goals or objectives at the meeting, and there was no one present to explain the proposed reading plan.

The IEP presented after September 14, 2004 to the parents proposed that C.R. be placed into special class programs for all academic subjects except for math, for which he would be in a general education classroom. Speech and language services were recommended to fit the District's "six-day cycle." The expectation was that C.R. would be pulled from his classes three times per six-day cycle for related services. The CSE recommended that C.R. have the use of a scribe based on its belief that Kildonan had advocated this service.

No class schedule was ever presented for C.R. for the school year; defendant contends that this was because C.R. was attending Kildonan for the school year.

## II. Parents' Placement at Kildonan

According to its promotional materials, the Kildonan School is a school dedicated to serving the needs of dyslexic students. It is located in Amenia, New York. The academic program utilizes the Orton–Gillingham approach to reading instruction. According to Dr. Lane, Kildonan is one of six schools certified by the Academy of Orton–Gillingham Practitioners and Educators. The school structures its mathematics, history, literature and science courses to meet the needs of its dyslexic students. Class sizes are small, and classes are structured to encourage all students to read. Dr. Lane observed that for eighth-grade students, classes would never exceed ten students. All students, he testified, receive one-on-one instruction. Dr. Lane further testified that C.R. was a perfect fit at Kildonan. According to C.R.'s mother, C.R.'s daily commute is 50 minutes each way.

At the time relevant to this action, C.R. was functioning three to five years below grade level in language arts. Dr. Lane testified that C.R. had "done well in the three years ... that he's been with us.... We were also able to see gains on a daily basis within his acquisition or remediation of basic language skills...." Dr. Lane noted that it "was very clear to us even after two years that [C.R.] still had progress to make within our program, and especially in preparation for high school when the demands drastically increase." Dr. Lane further opined that it was important for C.R. to have "enough one-on-one contact."

Dr. Rissenberg, C.R.'s neuropsychologist, testified that C.R. had severely delayed academic skills primarily in language areas, reading, writing and spelling. She stated that C.R.'s cognitive profile was "complex." She suggested that C.R. "needed more intensive individualized specialized instruction in order to begin making progress."

C.R.'s father testified that one reason he was removed from public school was that, at the end of fourth grade, one of C.R.'s speech teachers recommended that he be discharged from the speech therapy program. Despite that, C.R. was not placed in a speech therapy program at Kildonan. C.R.'s mother testified that she did not feel that such speech therapy remained necessary.

Kildonan provided no assistive technology for C.R. Dr. Lane testified that C.R. was taught keyboarding and spell check-

ing. Kildonan did not have specific plans to address C.R.'s organizational difficulties, his writing defects or his attentional difficulties. Plaintiffs argue that Kildonan's entire program addresses C.R.'s organizational difficulties, his writing defect or his attentional difficulties.

C.R.'s grades improved during his eighth-grade year at Kildonan.

### III. Determination of Impartial Hearing Officer

Plaintiffs sought a hearing before an impartial hearing officer ("IHO") to obtain reimbursement for the tuition expenses incurred in C.R.'s placement at the Kildonan School.

The IHO held seven days of hearings, after which she issued a two-part ruling. First, she found, relying on *School Comm. of Burlington v. Dep't of Ed.*, 471 U.S. 359, 370, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985), that the IEP failed to provide C.R. with a free appropriate public education ("FAPE"). Second, the IHO concluded that C.R.'s parents had failed to establish that the placement at Kildonan provided C.R. with appropriate programs and services.

As to the deficiencies in the IEP, the IHO found that (1) the CSE meetings did not include teachers required to be present under the relevant law; (2) the CSE attendees were not provided with the relevant materials to be considered in fashioning the IEP; (3) the district was unable to provide the requisite information concerning the classes that C.R. would have been enrolled in; and (4) the parents were provided with the IEP after the school year had begun.

### IV. State Review Officer

Following the IHO's decision, plaintiffs appealed the ruling to a SRO; the Board of Education filed a cross-appeal. The SRO upheld the IHO's decision and dis-

missed the parents' and school district's appeals.

As to the IEP, the SRO found that IEP was deficient because (1) the composition of the CSE meeting was deficient; (2) the CSE members did not have timely evaluative data relating to C.R.; (3) the IEP was put in place after the school year began; and (4) the school district failed to offer an appropriate program during the August 2004 CSE meeting. Therefore, the SRO concluded that the IEP did not offer C.R. a FAPE.

Concerning the IHO's conclusion that plaintiffs failed to show that they were entitled to tuition reimbursement, the SRO affirmed this ruling, finding that the parents had not met their burden that placement at Kildonan was appropriate for the 2004–05 school year. The SRO did not address whether equitable considerations supported the parents' claim.

Following the issuance of the SRO's decision, plaintiffs commenced the instant suit.

### DISCUSSION

Generally, a motion for summary judgment must be granted if the pleadings, discovery materials before the court and any affidavits show that there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

A dispute regarding a material fact is genuine if there is sufficient evidence that a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden is on the moving party to demonstrate the absence of any material factual

issue genuinely in dispute. *Am. Int'l Group, Inc. v. London Am. Int'l Corp.*, 664 F.2d 348, 351 (2d Cir.1981).

If a nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, then summary judgment is appropriate. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548. If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met. *Liberty Lobby*, 477 U.S. at 249, 106 S.Ct. 2505. The mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient; there must be evidence on which the jury could reasonably find for him. *See Dawson v. County of Westchester*, 373 F.3d 265, 272 (2d Cir.2004).

On summary judgment, the court resolves all ambiguities and draws all permissible factual inferences in favor of the nonmoving party. *See Patterson v. County of Oneida*, 375 F.3d 206, 218 (2d Cir. 2004). If there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper. *See Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir.2004).

■ In an IDEA appeal, however, a motion for summary judgment may "trigger[ ] more than an inquiry into possible disputed issues of fact." *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 83 n. 3 (2d Cir.2005). Courts have remarked that summary judgment "appears to be the most pragmatic procedural mechanism in the Federal Rules for resolving IDEA actions." *Wall v. Mattituck–Cutchogue School District*, 945 F.Supp. 501, 508 (E.D.N.Y.1996); *see also Lillbask*, 397 F.3d at 83 n. 3; *Warton v. New Fairfield Bd. of Educ.*, 217 F.Supp.2d 261, 269 (D.Conn.2002); *Loren F. ex rel. Fisher v. Atlanta Independent School Sys.*, 349 F.3d 1309, 1313 (11th Cir.2003) (observing that summary judgment in IDEA cases has been deemed appropriate even when facts are in dispute). ·

■ In the IDEA context, a motion for summary judgment should not be treated as an ordinary motion pursuant to rule 56 of the Federal Rules of Civil Procedure. *See Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 892 (9th Cir.1995) ("Though the parties may call the procedure a 'motion for summary judgment' . . ., the procedure is in substance an appeal from an administrative determination, not a summary judgment."). Rather, the court must determine "whether the administrative record, together with any additional evidence, establishes that there has been compliance with IDEA's processes and that the child's educational needs have been appropriately addressed. It matters not, in this context, who initiates the motion." *Wall*, 945 F.Supp. at 508.

■ Because the IDEA requires substantial deference to state administrative bodies on matters of educational policy, *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 191 (2d Cir.2005), the court's review must be both deferential and independent. *See A.E. v. Westport Bd. of Educ.*, 463 F.Supp.2d 208, 215 (D.Conn. 2006). The Supreme Court has cautioned courts not to substitute their own notions of sound educational policy for those of the school authorities which they review. *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). Because of the relative institutional expertise of the school district compared to the court, the court must give "due weight" to the school's proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of

educational policy; nevertheless, the court should not simply rubber stamp administrative decisions. *Cerra*, 427 F.3d at 191–192. "Deference is particularly appropriate when, as here, the state hearing officer's review has been thorough and careful." *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir.1998); *see also Rowley*, 458 U.S. at 207, 102 S.Ct. 3034 (noting that courts must be careful to avoid imposing their view of preferable educational methods upon school districts). The standard of review is by a preponderance of the evidence. *Heather S. v. Wisconsin*, 125 F.3d 1045, 1052 (7th Cir.1997).

## I. IDEA

The IDEA provides federal grants to states so that they may in turn provide disabled children with "a free appropriate public education" in the least restrictive, appropriate environment. *See* 20 U.S.C. § 1412(a)(1)(A); *see also Rowley*, 458 U.S. at 181, 102 S.Ct. 3034. Under the IDEA, the student's educators and parents meet and jointly develop an IEP for each year of the child's education. *See* 20 U.S.C. § 1414(d)(1)(B). The IDEA further provides that the "special education" developed for a child in an IEP must be "specially designed instruction, at no cost to parents or guardians, [and] meet[ ] the unique needs of a child with a disability, including—(A) instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and (B) instruction in physical education." 20 U.S.C. § 1401(29). The "related services" that may be a necessary part of an IEP include:

> transportation, and such developmental, corrective, and other supportive services (including speech pathology and audiology, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, counseling services, including rehabilitation counseling, and medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education. . . .

*Id.* § 1401(26).

The IDEA provides for procedural safeguards through which parents can ensure their child's education. *See* 20 U.S.C. § 1415. As the Court of Appeals has noted:

> A child's parents must be notified regarding any proposed change in a child's educational program. *Id.* § 1415(b)(1)(C). If a child's parents are dissatisfied with an IEP, or anything related to the child's education, they may file a complaint with the state educational agency. *Id.* § 1415(b)(1)(E). Such complaints must be resolved at an "impartial due process hearing." *Id.* § 1415(b)(2), (c). Any party aggrieved by the outcome of the state administrative proceeding may bring an action in any state or federal court of competent jurisdiction. *Id.* § 1415(e)(2). A court reviewing the findings and conclusions reached in a state administrative proceeding must base its decision on the preponderance of the evidence, after reviewing the administrative record and any additional evidence presented. *Id.* § 1415(e)(2).

*Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1116 (2d Cir.1997). The specific procedural safeguards include the rights "to examine all records relating to [the] child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to such child and to obtain an independent educational evaluation of the child," *id.* § 1415(b)(1), written notice prior to any changes in the child's identification, evaluation or educational placement, *id.*

§ 1415(b)(3), "an opportunity to present complaints with respect to" such matters, *id.* § 1415(b)(6), and, whenever any such complaint is made, the right to "an impartial due process hearing ... by the State educational agency or by the local educational agency," with corresponding rights to be accompanied and advised by counsel, to present evidence and cross-examine witnesses, to receive a written record of proceedings, and to receive written findings of fact and decisions. *Id.* §§ 1415(f)(1), (h).

In New York, parents who believe that an IEP is insufficient under the IDEA may challenge it in an "impartial due process hearing" before an IHO, who is appointed by the local board of education. N.Y. Educ. L. § 4404(1). The burden lies with the school district to demonstrate the appropriateness of the proposed IEP. *See, e.g., Walczak,* 142 F.3d at 122 (collecting cases). The IHO's decision may be appealed to an SRO. N.Y. Educ. L. § 4404(2). The SRO's decision may be challenged in district court. 20 U.S.C. § 1415(i)(2)(A).

## II. Appropriateness of the IEP

Defendant appeals the SRO's decision that C.R.'s IEP was inappropriate and failed to provide him with FAPE.

To determine whether an IEP is appropriate, the court must make a two-fold inquiry. First, has the district complied with the procedures set forth in the IDEA? Second, is the IEP as developed through the IDEA's procedures "reasonably calculated to enable the child to receive educational benefits?" *Rowley,* 458 U.S. at 206–07, 102 S.Ct. 3034. The party seeking relief bears the burden of satisfying both prongs of this inquiry by a preponderance of the evidence. *Schaffer v. Weast,* 546 U.S. 49, 62, 126 S.Ct. 528, 163 L.Ed.2d 387 (2005).

As the Second Circuit Court of Appeals has stated, not "every procedural error in the development of an IEP renders that IEP legally inadequate under the IDEA." *Grim v. Rhinebeck Cent. Sch. Dist.,* 346 F.3d 377 (2d Cir.2003). Rather, FAPE is denied where "procedural inadequacies that individually or cumulatively result in the loss or educational opportunity or seriously infringe on a parent's participation in the creation or formulation of the IEP...." *Werner v. Clarkstown Cent. Sch. Dist.,* 363 F.Supp.2d 656, 659 (S.D.N.Y.2005); *see also* 20 U.S.C. § 1415(f)(3)(E)(ii).

### A. Procedural Violations

The SRO found certain procedural defects in the IEP. Specifically, he found that the IEP was formulated and put into place after the school year had begun and that the CSE meetings did not consist of appropriate membership. The Court will first address these procedural violations before addressing the substantive violations found by the SRO.

School districts must ensure that an IEP is in effect by the start of the school year. *See Cerra,* 427 F.3d at 194; 34 C.F.R. § 300.323(a) ("At the beginning of each school year, each public agency must have in effect, for each child with a disability within its jurisdiction, an IEP ...."); *but see D.D. v. N.Y. City Bd. of Educ.,* 465 F.3d 503, 514 (2d Cir.2006) (stating that under 34 C.F.R. § 330.342, predecessor to 34 C.F.R. § 300.323, states had to implement IEP "as soon as possible" after it had been developed). Defendant does not dispute that there was no IEP put in place or implemented prior to the start of the 2004–05 school year.

Under New York law, a CSE meeting must consist of (1) the student's parents; (2) at least one of the student's regular education teachers; (3) at least one of the

student's special education teachers or "providers;" (4) a school psychologist; (5) a representative of the school district who can comment on the school's education curriculum and resources; and (6) an individual who can interpret the instructional implications of evaluation results. 8 N.Y.C.R.R. § 200.3(a)(1). Federal law requires similar membership in the team that creates the IEP. 20 U.S.C. § 1414(d)(1)(B).

■ The attendees of the May 2004 and August 2004 CSE meetings did not include an eighth grade teacher who may have worked with C.R. during the upcoming school year. In addition, there was no special education teacher at the August 2004 meeting who may have worked with C.R. in the 2004–05 school year. The SRO found that the deficiencies in the CSE meeting "significantly impeded parental participation in the formulation of the IEP and denied the student educational benefits." The Court agrees with the SRO's conclusion in this regard. Without a regular education teacher or a special education teacher present at the meetings, plaintiffs were denied the ability to examine the likely curricular requirements that C.R. would face in the eighth grade and the possible modifications and alternative services that would help C.R. during that year.

For these two procedural deficiencies, the Court finds that C.R.'s IEP was procedurally deficient and denied him FAPE.

### B. Substantive Violations

■ The school district argues that the IEP was appropriate for C.R., relying on Judge Robinson's ruling in the previous case.

The record, however, belies this argument. As the SRO pointed out, no goals or objectives were discussed at the August 2004 CSE meeting. Nor were any eighth-grade teachers present who could have

discussed programs available to C.R. At that meeting, the placement was yet to be determined. Another CSE meeting was not held prior to the start of the school year to alleviate plaintiffs' concerns over C.R.'s curriculum. Without these plans, goals and objectives met, the requirements of the IDEA could not be met. Judge Robinson's ruling had the benefit of an in-place IEP; there was no such IEP in this case.

The Court agrees with the SRO that the cumulative effect of all of these deficiencies in the IEP and the formulation process combined to deny C.R. FAPE.

### II. C.R.'s Placement at Kildonan

In his decision, the SRO found that the placement at Kildonan was not appropriately designed and implemented given C.R.'s education needs. Specifically, the SRO observed that (1) Kildonan did not develop a behavior plan that would address C.R.'s difficulty with focus and attention, but instead relied on an unsuccessful strategy; (2) Kildonan's emphasis on multisensory methods was not necessarily suitable for C.R.; (3) certain strategies and approaches meant to assist C.R. were not put into place; and (4) no adjustments were made to the Kildonan program to tailor it to fit C.R.'s individual needs. The SRO also agreed with the IHO's conclusion that the private neuropsychologist's conclusions were not based on sufficient information to be credible.

■ The IDEA authorizes parents to be reimbursed for the unilateral placement of their child in a private program if (1) such placement was proper under the IDEA and (2) the IEP calling for placement in a public school is inappropriate. *Burlington,* 471 U.S. at 370, 105 S.Ct. 1996. The court must also examine whether equitable considerations support the claim for reimbursement. *See Frank G. v.*

*Bd. of Educ. of Hyde Park*, 459 F.3d 356, 363–64 (2d Cir.2006).

 Parents who unilaterally place their child in an alternative placement are not held to the same standard as a school board. *See M.S. v. Yonkers Bd. of Educ.*, 231 F.3d 96, 105 (2d Cir.2000), *abrogated on other grounds by Schaffer*, 546 U.S. at 57–58, 126 S.Ct. 528; *see also Warren G. v. Cumberland County Sch. Dist.*, 190 F.3d 80, 84 (3d Cir.1999) ("The test for the parents' private placement is that it is appropriate, and not that it is perfect."). Rather, parents are to be reimbursed for the unilateral private placement where "it provides education instruction specifically designed to meet the unique needs of a handicapped child." *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 115 (2d Cir.2007). The private placement must "at a minimum, provide some element of special education services in which the public school placement was deficient." *Frank G. v. Bd. of Educ.*, 459 F.3d 356, 365 (2d Cir.2006).

The Court of Appeals has instructed district courts to "defer to the SRO's educational experience" especially where the materials before the court consist solely of the materials before the SRO. *M.S.*, 231 F.3d at 105; *see also Cabouli v. Chappaqua Cent. Sch. Dist.*, 202 Fed.Appx. 519, 521 (2d Cir.2006) (District court is "expected to give due weight to these proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy."); *Walczak*, 142 F.3d at 129 (stating that federal courts are required to give "due weight" to state administrative proceedings under the IDEA).

 Plaintiffs argue that equity requires that they be reimbursed for C.R. placement at Kildonan. Specifically, they contend that after the school district failed to provide FAPE, they chose to place their son at Kildonan and the Court should defer to that choice, even if the program at Kildonan did not meet "each and every ancillary condition." The parents also point out that Kildonan is the only school in Dutchess County that is approved for a student like C.R.

The crux of the parents' argument is that they chose a proper placement by placing their son at the Kildonan School, a school "exclusively designed and implemented for students with learning disabilities." The parents' contentions require that the Court make a prospective judgment about the reasonableness of their placement without looking at the actual results.

Whether to review a placement prospectively or retroactively, however, remains an open question in the Second Circuit. *See D.F. ex rel. N.F. v. Ramapo Cent. Sch. Dist.*, 430 F.3d 595, 598–99 (2d Cir.2005) ("This court, however, has not established whether, and to what extent, retrospective evidence of a student's progress—or the lack thereof—should be considered in determining the validity of an IEP in which the student is currently enrolled.... [T]his court has not, as yet, decided if it is error to consider retrospective evidence in assessing the substantive validity of an IEP."); *Matrejek v. Brewster Cent. Sch. Dist.*, 471 F.Supp.2d 415, 431 (S.D.N.Y. 2007) ("[T]he validity of using retrospective evidence to evaluate either an IEP or a parent's private placement decision remains unsettled in this Circuit."), *aff'd*, 293 Fed.Appx. 20 (2d Cir.2008). The Court of Appeals has gone so far as to affirm a district court's finding that a private school placement was inappropriate where the student had failed to make progress at the school. *See M.S. v. Yonkers Bd. of Educ.*, 231 F.3d 96, 104 (2d Cir.2000).

Plaintiffs point to no cases from this circuit where the court relied completely

on prospective potential regarding the school to approve of a unilateral private placement. In *Briere by & Through Brown v. Fair Haven Grade Sch. Dist.*, 948 F.Supp. 1242 (D.Vt.1996), relied on by plaintiffs, the court analyzed how the student progressed in her placement. *See id.*, 948 F.Supp. at 1257 ("She became more vocal in class and in social settings. She progressed academically. Her sense of self-esteem improved, as did her ability to work independently. Her test scores and teacher reports reflected that progress."). Similarly, in *Walczak*, the Court of Appeals discussed specific areas of the student's academic record that showed improvement. *See Walczak*, 142 F.3d at 130–31. Plaintiffs' statement that "there is no basis for applying end-of-year results to the parents' initial placement decision" is thus unsupported by the relevant precedent.

Dr. Lane's testimony regarding C.R.'s progress demonstrates that C.R. was not making progress at Kildonan relative to his peers. Dr. Lane testified that his writing skills, reading skills and decoding skills had all declined relative to C.R.'s peer levels. Similarly, C.R. stated that with regard to reading, he was "not good." These facts weigh more heavily with the Court in reviewing the SRO's ruling than C.R.'s improving grades during the eighth grade.

The parents' argument relies on the promise of what the Kildonan School could provide. They point to the structure of its programs as evidenced by its brochure and promotional materials. The Court has two problems with this. First, despite its promise, the Kildonan School failed to deliver positive results. Second, Kildonan failed to tailor its program to C.R.'s specific needs, as described by the SRO in his ruling. The Court cannot reverse the SRO's findings based on the potential that

Kildonan holds for C.R. without firmer evidence that it has been successful.

The Court recognizes that plaintiffs are in a difficult position with regard to their son. The Court cannot, however, find that placement at Kildonan is reasonable under the law without successful results. Therefore, the Court will grant defendant's motion with regard to the parents' requested reimbursement for C.R.'s tuition at the Kildonan School. The preponderance of the evidence simply does not support the conclusion that the Kildonan School provides a curriculum specifically tailored to C.R.'s needs.

## CONCLUSION

For the foregoing reasons, the Court DENIES both motions for summary judgment (Docs. # 6, 7). The Clerk is instructed to close this case.