**Gershon ROSS and Marlene W. Ross, as Guardian for Gershon Ross, Plaintiffs,**

v.

**The FRAMINGHAM SCHOOL COMMITTEE, Town of Framingham, Massachusetts Department of Education, Defendants.**

**No. Civ.A. 96–12422–REK.**

United States District Court, D. Massachusetts.

April 21, 1999.

Gershon Ross, Framingham, MA, plaintiff pro se.

Marlene W. Ross, Framingham, MA, plaintiff pro se.

Phillip B. Benjamin, Office of Town Counsel, Framingham, MA, Aaron K. Bikofsky, Bikofsky & White, Framingham, MA, for Framingham School Committee the, defendant.

Phillip B. Benjamin, Office of Town Counsel, Framingham, MA, for Framingham, Town of, defendant.

Amy Spector, Assistant Atty General, Office of the Atty General, Boston, MA, for Massachusetts Department of Education, defendant.

## Opinion

KEETON, District Judge.

This case arises under the Individuals with Disabilities Education Act (IDEA). Plaintiffs seek review of a decision by a state administrative officer that the local educational agency did "implement" and "comply with" the student's Individualized Education Plans (IEPs) for the years 1992–95.

In this case, the plaintiffs do not challenge the "appropriateness" of the student's IEPs. Instead, plaintiffs contend (1) that the school district "failed to implement" certain aspects of the student's IEP, (2) that the failure to provide the services specified in those aspects deprived the student of his entitlement to a "free appropriate public education" under the IDEA, and (3) that the student is entitled to compensatory education beyond his twenty-second birthday.

The defendants moved for summary judgment. For the reasons explained below, the court ALLOWS summary judgment for defendants.

## I. Procedural and Factual Background

### A. Pending Matters

Pending before the court for disposition are the following motions, together with other relevant submissions that are included in the following list of filings:

(1) Defendants', Framingham School Committee and Town of Framingham, Motion for Summary Judgment (Docket No. 27, filed November 21, 1997).

(2) State Defendant's Motion for Summary Judgment (Docket No. 33, filed December 11, 1997).

(3) Plaintiffs' Motion to Order Complete Administrative Record Re: Bureau of Special Education Appeals # 96–0543 (Docket No. 35, filed January 6, 1998). Defendants filed opposition (Docket No. 37, filed January 16, 1998).

(4) Plaintiffs' Opposition to Both Motions for Summary Judgment (Docket No. 38, filed January 27, 1998).

(5) Plaintiffs' Statement and Exhibits in response to the court's invitation (Docket No. 60, filed March 1, 1999).

(6) Plaintiffs' Additional Exhibits (filed March 1, 1999).

(7) Defendants, Framingham School Committee, and Town of Framingham Supplemental Memorandum (Docket No. 63, filed March 17, 1999).

(8) Table of Witnesses in Transcript of Hearing Testimony (Docket No. 64, filed March 17, 1999).

(9) Supplemental Memorandum in Support of State Defendant's Motion for Sum-

mary Judgment (Docket No. 65, filed March 17, 1999).

## B. Factual Background

Plaintiff Gershon Ross is a disabled student for purposes of the IDEA. Plaintiff Marlene W. Ross is Gershon's mother and guardian. She appears pro se, on behalf of both plaintiffs in this case. Gershon is twenty four and has suffered at all relevant times from severe autism.

Defendant Framingham School Committee is the local educational agency charged with administration of the IDEA for Gershon's school district. Most correspondence between the local educational agency and Ms. Ross, however, was printed on stationery of officers from "Framingham Public Schools, Department of Special Education." No party has disputed plaintiffs' identification of the named defendants.

Defendant Town of Framingham is allegedly the entity responsible for payment of the compensatory education benefits that plaintiffs seek.

Defendant Massachusetts Department of Education (MDE) is a "State educational agency" for purposes of the IDEA.

On August 12, 1995, plaintiffs filed a complaint before the Bureau of Special Education Appeals (BSEA) (the "State Defendant" in this court). This filing initiated a proceeding before the BSEA that was designated as No. 95–0543. This complaint alleged that the School Committee failed to "implement" Gershon's IEPs from November 1992 until August 1995.

On October 4, 1996, a Hearing Officer of the BSEA rendered a decision on plaintiffs' complaint in . BSEA No. 95–0543. The Hearing Officer determined that the School Committee had implemented and had complied with Gershon's IEPs.

On October 31, 1996, plaintiffs filed this civil action in this United States District Court, asking the court to review, under the IDEA, the October 4, 1996 decision of the Hearing Officer.

## II. Jurisdiction

This court has subject-matter jurisdiction in this case under 20 U.S.C. § 1415(e)(2), a section of the IDEA. The plaintiffs filed this civil action as parties "aggrieved by" an administrative decision of the BSEA of the defendant MDE. It is undisputed that plaintiffs have exhausted all state administrative remedies. The BSEA is a "State educational agency" for purposes of 20 U.S.C. § 1415(b)–(c).

For these reasons, I conclude that this court has jurisdiction based on a federal question under 28 U.S.C. § 1331.

## III. The Parties Contentions

At a hearing on September 10, 1997, the court, in light of the ambiguous pleadings in this case, ordered plaintiffs to file a precisely framed description of the claims that they assert in seeking review of the BSEA's determinations. On October 22, 1997, plaintiffs filed a Statement of Claims (Docket No. 25). Plaintiffs have further clarified their contentions in their Opposition to Summary Judgment and in their filings of March 1, 1999—(Docket No. 60) and the separately marked "Additional Exhibits" filed as item (6) in the listing above in Part I.A.

In their Statement of Claims (Docket No. 25), plaintiffs proposed twelve "claims." Many of these claims, however, were repetitive of other claims or of arguments in other motions filed with the court. Their Statement of March 1, 1999 (Docket No. 60) is structured and organized differently but is also mostly repetitive of the arguments and claims appearing in earlier filings in this civil action before this court.

Taking account of all "claims" stated by plaintiffs, the court understands that plaintiffs have set forth the following contentions in asking this court for relief:

*First Contention.* The Hearing Officer of the BSEA did not decide plaintiffs' complaint within prescribed time limits.
*Second Contention.* The Framingham School District did not "implement" or

comply with Gershon's IEPs for the academic years 1992–93, 1993–94, and 1994–95, thus failing to provide Gershon with a Free Appropriate Public Education (FAPE) in violation of the IDEA. Plaintiffs clarify that they challenge only the implementation of indisputably appropriate IEPs, not the "appropriateness" of Gershon's IEPs. Plaintiffs contend that the Hearing Officer correctly identified the issues presented by them:

(1) Whether Framingham failed to provide Gershon with written language materials as per the IEP so as to integrate the communication goal throughout all curriculum and across all settings?

(2) Whether Framingham failed to develop a comprehensive neuro-behavioral program for Gershon as per the IEP?

(3) Whether Framingham failed to provide consultation services by Dr. Dorsey as per the IEP?

(4) Whether Framingham failed to enroll Gershon at Mass Bay Community College thereby violating the student's rights under his IEP?

(5) Whether Framingham failed to disseminate relevant records to Metro West Mental Health Services ... [ (Metro West) ] ... so that the agency could provide job development/coach services to Gershon? If so,

(6) Whether Gershon is entitled to compensatory services beyond his 22nd birthday?

Administrative Record (Docket No. 14, filed April 3, 1997) at 4–5 (the Administrative Record—Docket Nos. 14–15—will be referred to as the "Record"). The decision of the Hearing Officer contained the following summary of plaintiffs' contention with respect to these identified issues with which the plaintiffs have agreed in their submissions:

The Parent/Student assert that Framingham violated the students' rights by failing to offer Gershon cer-tain services that were called for under his IEP, for the period covering September 1994 through August 1995. According to the Parent/Student, Framingham failed to provide the written language materials Gershon required across all settings and throughout all curriculum. The Parent/Student state that failure to provide the written language materials prevented Gershon from receiving any significant benefit from his entire four year high school program.

Framingham was also supposed to provide Gershon with a comprehensive neuro-behavioral program which was never implemented. Furthermore, it had agreed to fund consultation services by Dr. Dorsey for 5 hours per month which it failed to do. Gershon's IEP also called for enrollment in a course at Mass Bay Community College which the District failed to provide. Lastly, the Parent/Student assert that Framingham did not disseminate to Metro West the required materials to properly assess and service Gershon. As a result of Framingham's non-compliance with the services delineated for the student in his IEP, Gershon has suffered an interruption in services for which Framingham is now obligated to provide compensation. The Parent first sought four years, and now seeks five years of compensatory education and punitive damages in the amount of $100,000.00 dollars because of the intentional misrepresentations by the School.

Record at 5.

*Third Contention.* The Hearing officer's evaluative determination that the School District "implemented" Gershon's IEP is incorrect (1) as a matter of law; (2) because the Hearing Officer relied on witnesses that were not credible, were not "evaluators," and did not participate in the formulation of the IEPs; and (3)

reliance on the testimony of Dr. Cutler was inappropriate.

*Fourth Contention.* The Hearing Officer committed an error of law by excluding from the record before him all evidence bearing on events taking place before September 1994 and after August 1995 on the basis that "res judicata" and "collateral estoppel" barred any claims that the school district failed to implement the IEPs during the excluded periods.

*Fifth Contention.* The record now before the court is inadequate because it does not include certain Federal Monitoring Reports that were before the Hearing Officer. These Reports are prepared by a federal agency and allegedly document the MDE's IEP "implementation" practices.

*Sixth Contention.* The Hearing Officer made an error of law by taking judicial notice of the decisions in 12 previous cases filed by plaintiffs with the BSEA, and the decisions in two cases that they filed in federal district court appealing some of those decisions of the BSEA. The taking of judicial notice "demonstrates gross procedural violation, noncompliance, and willful intent by Framingham's Public Schools." Statement of Claims at Issue 10. The Hearing Officer, in taking judicial notice, became a co-conspirator with the School District in violating Gershon's "constitutional" right to a FAPE.

*Seventh Contention.* The decision of the Hearing Officer has caused undue financial burden on other agencies of the Commonwealth of Massachusetts.

In opposition to plaintiffs' theories of claim and contentions, and in moving for summary judgment against those claims, defendants set forth the following contentions:

*First Contention.* In response to plaintiffs' First, Fourth, Fifth, and Sixth contentions, defendants argue that plaintiffs have failed to proffer admissible evidence that may support a determination that Gershon suffered prejudice from procedural deficiencies in the implementation of the IEP or in the decision of the BSEA.

*Second Contention.* In response to plaintiffs' Second and Third Contentions, Framingham contends that, in the absence of evidence of harm resulting from particular procedural deficiencies, the decisive determination, as a matter of law, with respect to plaintiffs' claim for compensatory education is not whether "all of the student[']s goals and objectives ... have been reached," which Framingham concedes may not have occurred, but whether Framingham "offered Gershon a free appropriate public education in the least restrictive environment designed to meet Gershon's needs and maximize his educational potential." Record at 6. Defendants contend that the record before this court, as a matter of law, supports only an evaluative determination by this court that Gershon received a FAPE.

*Third Contention.* In response to plaintiffs' Seventh Contention, defendants contend that plaintiffs do not have standing.

Plaintiffs' Statement of Plaintiffs' Position filed on March 1, 1999 (Docket No. 60), is based on the exhibits filed along with it, which are part of the Administrative Records of the previous proceedings before the BSEA designated as BSEA 91–0229 and BSEA 92–0841. Plaintiffs' undertake to use them "here to demonstrate history and chronology for the Individualized Education Plan (IEP) formation" for the plaintiff Gershon Ross. Docket No. 60 at page 1.

The introductory portion of the statement, entitled "Plaintiffs' Position" at pages 1–2 of Docket No. 60, is a set of arguments and conclusions of Marlene W. Ross, plaintiff parent. Her statement of "Plaintiffs' Position" is continued at pages 5–7, pages 9–11, and pages 15–24, and, as

to "Plaintiffs' Position As They Relate to Issues of Harm," at pages 24–27.

This March 1, 1999 Statement of Plaintiffs' Position intermingles arguments regarding the seven contentions identified in Part III above. The central theme of this statement is

> that the Hearing Decision in Appeal before this court was not based on all the relevant evidence, in error of law, and therefore was not based on factual evidence. One question here lies with the lack of credibility of testimony that was given credence by the Hearing Officer in her decision making. The court should take note at the Administrative Record pg. 17 para. 2 where the hearing officer states: "... testimony provided by Dr. Dorsey, Ms. Villani, Ms. Vaillancourt, Mr. Macomber, and Ms. Kohland–Park to be particularly credible and reliable."

*Id.* at page 5. Thus, plaintiffs ask this court to override the BSEA. Hearing Officer decision now under review by making a finding that decisions of the BSEA Hearing Officer in the two earlier proceedings about credibility were wrong and should lead this court to make a decision that the Hearing Officer's decision and review is also fatally tainted by her errors as to credibility.

I find the seven contentions that plaintiffs' earlier submissions had identified to be a more suitable structure for considering plaintiffs' claims in this case than the structure of the March 1, 1999 statement. This opinion will proceed in that way, after taking note in Parts IV–VII of some preliminary matters.

### IV. Standard of Decision by the District Court in IDEA Cases

The IDEA provides that, in a civil action in which the plaintiffs challenge the decision of a state administrative officer's decision, the federal district court:

> shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and,

basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

20 U.S.C. § 1415(e)(2).

■ A district court in considering the findings of fact and evaluative findings of the educational agency under the IDEA must apply:

> an intermediate standard of review[,] ... a standard which, because it is characterized by independence of judgment, requires a more critical appraisal of the agency determination than clear-error review entails, but which, nevertheless, falls well short of complete *de novo* review.

> In the course of this independent review, the administrative proceedings must be accorded "due weight." Although the exact quantum of weight is subject to the district judge's exercise of informed discretion, the judge is not at liberty to turn a blind eye to administrative findings or to discard them without reason ... In the end, the judicial function at trial-court level is "one of involved oversight"; and in the course of that oversight, the persuasiveness of a particular administrative finding, or the lack thereof, is likely to tell the tale.

*Lenn v. Portland Sch. Comm.,* 998 F.2d 1083, 1086–87 (1st Cir.1993) (citations omitted). A federal trial court is "free to accept or reject the findings [of the hearing officer] in part or in whole" as long as it considers and responds to all material findings. *Burlington v. Department of Educ.,* 736 F.2d 773, 792 (1st Cir.1984), *aff'd,* 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). The federal court's review is appropriately "thorough yet deferential." *Kathleen H. v. Mass. Dept. of Education,* 154 F.3d 8, 13 (1st Cir.1998) (quoting *Roland M. v. Concord Sch. Comm.,* 910 F.2d 983, 989 (1st Cir.1990)).

■ Before reviewing the agency's findings, however, a court must determine whether the agency made any errors of law that may vitiate those findings. An

evaluative "finding" on a mixed legal-factual issue cannot stand if it is premised on an error of law.

Legal rulings are subject to nondeferential (or *de novo*) review in this court. A district court reviewing a state administrative officer's rulings of law under the IDEA framework is acting appropriately in disregarding any rulings about applicable law that are not in conformity with applicable statutes and precedents. *See Abrahamson v. Hershman,* 701 F.2d 223, 231 (1st Cir.1983). *See also Kathleen H., supra.* No deferential review is appropriate even if the rulings of law concern interpretation of a state statute or state judicial decisions rather than federal law. This point is implicit in the reasoning denying plaintiffs' claim for attorneys' fees in *Kathleen H., supra,* at *5–8, even if one reads that opinion as not focusing explicitly on that aspect of the plaintiffs' claims affected by interpretation of state law.

With respect to a hearing officer's findings of fact, a reviewing district court·is directed to give due deference to them. As just noted, however, the mandate of due deference does not require deference to a finding ·the cogency of which is impaired by the hearing officer's dependence on an error of law. Also, a district court may disregard an administrative officer's findings of fact whenever the court determines that they are unreliable or incorrect in light of the totality of the record. *See Abrahamson,* 701 F.2d at 230.

### V. Summary Judgment Standard

· This court must deny defendants' motion for summary judgment if· a genuine dispute of material fact exists in the case. Fed.R.Civ.P. 56.

Under the law of this circuit, it is sometimes appropriate for the trial court to use a two-phase process in deciding a motion for summary judgment. Under that process, the court determines first whether the movant has made a preliminary show-ing that no issue of material fact remains. If so, the court may then require that the nonmovant "demonstrate, through specific facts, that a trialworthy issue remains." *Cadle Co. v. Hayes,* 116 F.3d 957, 960 (1st Cir.1997). I have concluded that it is appropriate to use this two-phase process in this case, in which the court is considering a motion for summary judgment in an action under 20 U.S.C. § 1415(e)(2). *See Murphy v. Timberlane Regional Sch. Dist.,* 22 F.3d 1186, 1196 (1st Cir.1994); *Norton Sch. Committee v. Massachusetts Dept. of Educ.,* 768 F.Supp. 900, 904 (D.Mass.1991).

In this case, the plaintiffs (nonmovants) have the burden of proof at trial because they are the parties challenging the decision of the BSEA ·Hearing Officer. *Hampton Sch. Dist. v. Dobrowolski,* 976 F.2d 48, 54 (1st Cir.1992).

After a preliminary showing by the moving parties in this case, both under *Dobrowolski* and under the two-phase process explained in *Cadle,* the plaintiffs must "produce evidence which would be admissible at trial to make the requisite issue of material fact." *Kelly v. United States,* 924 F.2d 355, 357 (1st Cir.1991). If the plaintiffs are unable to proffer such evidence to the court, judgment as a matter of law may be ordered because they have failed to show that a genuine dispute exists as to any material fact. In this case, plaintiffs were allowed multiple opportunities to make a proffer, and in this decision the court is considering, along with all earlier filings, the Plaintiffs' Statement of March 1, 1999 and other filings of the parties after that date.

### VI. Added Complexity of Summary Judgment in cases under IDEA

· The distinctive standard of decision for IDEA cases, explained in Part III, contributes an added layer of complexity to the standard of decision ordinarily· applicable to motions for summary judgment. . How precisely is the standard of "due defer-

ence" to be applied at the summary-judgment stage of proceedings?

In deciding a motion for summary judgment, a court is not authorized to make findings of fact. Ordinarily, the court must decide the motion on the basis of undisputed facts, and the motion must be denied if the opposing parties have succeeded in identifying any factual issue that is genuinely in dispute and material to outcome under applicable law.

The guidance in precedent is not crystal clear about how a district court is to incorporate into the summary-judgment context the district court's duty to give "due deference" to findings of fact and evaluative determinations of the state administrative officer. See generally Capistrano Unified Sch. Dist. v. Wartenberg, 59 F.3d 884, 892 (9th Cir.1995) (noting "puzzling procedural problem" of decision of summary judgment motion on IDEA claim in light of applicable standard of due deference to findings of state administrative officer).

■ One guidepost that is well settled is that, if the challenge to identified administrative findings and evaluative determinations is without merit on legal grounds, the court may give deference to those findings when considering summary judgment, and may grant the motion if it determines that other challenged findings and determinations become immaterial to outcome. Indeed, this proposition is inherent in the recognition that a district court does, at least in some circumstances, have authority to decide an IDEA challenge on a motion for summary judgment. Stated another way, the point is that a court is authorized to decide the case "as a matter of law" on motion for summary judgment if enough of the administrative findings and evaluative determinations are so well-founded that any other finding of fact that might be questioned is no longer material to outcome.

In opposing motions for summary judgment, plaintiffs are allowed the opportunity to proffer to this court additional admissible evidence. They are not entitled, however, to defer their proffer until trial. A reasonable time limit may be enforced by the court to avoid the waste of public and private resources incident to convening a trial when plaintiffs are unable to show that they can present material disputes of fact or evaluation at trial.

## VII. Identification of Plaintiffs' Claims Under the IDEA

First and foremost, plaintiffs base their claims on the proposition that individuals with disabilities are entitled to a FAPE under the IDEA.

In exercising its authority under the IDEA, a district court frequently must address the following questions:

First, has the State complied with the procedures set forth in the Act?

Second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?

Board of Educ. v. Rowley, 458 U.S. 176, 206–07, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982).

As to the first prong of Rowley, this court understands plaintiffs' First, Fourth, Fifth, and Sixth Contentions as claims that procedural deficiencies in the BSEA's determination of plaintiffs' action before that body deprived Gershon of a FAPE. The court also understands those contentions as claims that the Hearing Officer's findings and evaluative determinations are tainted and that this court should not defer to those determinations in conducting its independent review of the administrative record and any additional admissible evidence proffered in the proceedings in this court.

As to the second prong of Rowley, the parties agree that it is undisputed that Gershon's IEPs have been "reasonably calculated to enable [him] to receive educational benefits." Plaintiffs, however, claim that the School Committee did not "implement" or "comply with" each of the

IEPs for the period to which it applied. For the reasons explained in Part IX.A below, I conclude that defendants are not correct in contending that a claim alleging a failure to implement, or alleging non-compliance with, an IEP fails unless the plaintiffs show that the IEP was not "reasonably calculated to enable the child to receive educational benefits." Rather, a distinct evaluative determination is required as to whether the IEPs were "implemented," or complied with, if plaintiffs have proffered sufficient evidence to present a trialworthy issue regarding implementation, or regarding compliance.

### VIII. Claims of "Procedural Violations"

### A. Introduction

The defendants have moved for summary judgment on plaintiffs' claims that this court has identified in Part III above as plaintiffs' First, Fifth, Sixth, and Seventh Contentions. All of these are contentions, under the first prong of *Rowley,* that the school district and the BSEA failed to follow "procedures" set forth in the IDEA or promulgated under the authority of the IDEA. In addition, a conclusion by this court that one of these "procedural" violations occurred, even if not supporting a final adjudication for plaintiffs under the IDEA, may contribute some weight to the support in the record as a whole for a determination that no or little deference is due to the findings and evaluative determinations of the Hearing Officer with respect to the claim that the School Committee did not implement (or did not comply with) Gershon's IEPs.

Did the Hearing Officer commit any procedural violations for which plaintiffs may seek relief in this court? Did procedural errors of the Hearing Officer make his determinations so tainted and unreliable that this court should not give any deference to them?

■ Plaintiffs appear at times to be arguing that the fact of ongoing efforts of the School Committee, the Town, and their representatives to refine the IEP in each new period must be treated by this court as an acknowledgment that each earlier IEP was inadequate. *See, e.g.,* Docket No. 25, ¶ 10. Although I consider this possible inference along with others, I reject the argument that the court must treat ongoing efforts as acknowledgment of inadequacy of previous IEPs. The First Circuit has stated in a closely analogous case, that since an IEP must be reviewed annually, the "fact that [the Town of] Mansfield revised [the student's] IEP between the 1994–95 and the 1995–96 school years is not evidence that the IEP for the previous year was inadequate." *Kathleen H.,* 154 F.3d 8, 14 (1st Cir.1998).

For this reason, along with the reasons stated below in this Part, I conclude, as a matter of law, that, under the IDEA, *Rowley,* and other applicable federal and state law, none of the alleged procedural violations in this case, even if proved, automatically entitles plaintiffs' to a remedy.

### B. Plaintiffs' First Contention: Claim of Tardy Decision

■ In plaintiffs' First Contention, they assert that the BSEA missed a 45–day deadline for rendering decision on their claims. Applicable federal regulations prescribe this deadline. *See* 34 C.F.R. § 300.512(a)(1).

Plaintiffs, in opposing summary judgment against plaintiffs on this contention, must do more than show that the BSEA indisputably violated the deadline. Plaintiffs must proffer admissible evidence that the violation of the deadline "compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits." *Amann v. Stow Sch. Sys.,* 982 F.2d 644, 652 (1st Cir.1992) (citation omitted). In other words, plaintiffs must proffer admissible evidence that, if credited, may reasonably support a determination that the failure to comply with

the deadline caused "prejudice" to them. *Id.* at 653.

In this case, plaintiffs have failed to point to any evidence in the record or to proffer any additional evidence in their submissions in this court that would support a determination that the delay caused prejudice to plaintiffs. At the time that plaintiffs filed their complaint with the BSEA, only two weeks remained before Gershon's twenty-second birthday. In addition, all claims were for compensatory education and not for prospective equitable or other relief. The delay did not deprive Gershon of access to any benefits or to any remedies to which Gershon was entitled.

For these reasons, I conclude that defendants are entitled to summary judgment on the claim that this court has identified as plaintiffs' First Contention (that the Hearing Officer of the BSEA did not decide plaintiffs' complaint within the prescribed time limits).

Also, I conclude that plaintiffs have failed to proffer any admissible evidence that would support a determination that the delay tainted the persuasiveness or correctness of the Hearing Officer's findings or evaluative determinations.

### c. Fourth and Sixth Contentions: BSEA's Rulings on Scope of Evidence

In the claim that this court has identified as plaintiffs' Fourth Contention, plaintiffs assert that the Hearing officer committed an error of law by excluding from the record before him all evidence bearing on events taking place before the period of September 1994 to August 1995. This ruling of the Hearing Officer was based on the Hearing officer's determination, which plaintiffs also challenge in their Sixth Contention, that any claim that the School Committee did not implement the IEPs for periods other than the 1994–95 school year was barred, under doctrines of collateral estoppel and res judicata, because the BSEA and federal district courts had already fully and fairly determined those claims in other actions before them. Plaintiff argues that the decision to "take judicial notice" of these other decisions and exclude purportedly contradictory evidence (1) "demonstrates gross procedural violation, noncompliance, and willful intent by Framingham's Public Schools," Statement of Claims at Issue 10, and (2) makes the BSEA's Hearing Officer a co-conspirator with the School Committee in violating Gershon's "constitutional" right to a FAPE.

The decision of the Hearing Officer briefly describes her rulings on the scope of evidence and the previous administrative and judicial decisions.

On December 19, 1994, Framingham filed a motion to dismiss some of the claims raised by the Parent/Student on December 4th. Res Judicata and Collateral Estoppel barred the Parent from relitigating issues and claims raised before the BSEA unsuccessfully in several past proceedings. On January 4, 1995, the BSEA entered a Ruling Granting the School's request and limiting the issues to be decided at Hearing....

[footnote 3 following text] The Ruling of January 4, 1996, states in pertinent part:

1. All claims prior to September 1994, raised by the Parent/Student in issues # 1, 2, 3 and 7 are hereby disallowed and dismissed. A ruling was entered at the Pre–Hearing limiting the scope of the Hearing to claims arising between September 1994 and August 1995; all prior claims have been adjudicated through numerous prior BSEA proceedings. Should the School be found to have failed to provide the Student a Free Appropriate Public Education at Hearing, the maximum length of compensatory education the student would be entitled to receive would be equivalent to one year. Neither punitive nor monetary damages will be awarded.

Record at 4.

Plaintiffs ask this court to conclude that the Hearing Officer's determinations of is-

sue-and-claim preclusion were erroneous as a matter of law, and that the evidentiary rulings based on those determinations were also erroneous as a matter of law.

Had the Hearing Officer expressed her conclusion as a discretionary determination that the thoroughness of previous hearings and opportunities for plaintiffs to present their arguments and evidence warranted denial of plaintiffs' request for another hearing of those matters, not supported by a proffer of reasons for expecting any different set of material grounds to be developed in the new hearing, in my view her decision would have been sound and fair and entitled to due deference. I conclude that I should not reach a different outcome because she reasoned her decision against a new hearing of these same issues on issue-preclusion or claim-preclusion grounds. I cannot say, as plaintiffs would have me say, that this view of applicable state law of issue preclusion and claim preclusion is erroneous. To do so, I would have to predict a state-law ruling beyond any decision thus far announced by a state court. This is a form of state-law determination that guiding precedents of the First circuit say a United States district court should be wary of making. *Acadia Motors, Inc. v. Ford Motor Co.*, 44 F.3d 1050, 1057 (1st Cir.1995) ("As we have repeatedly warned, federal courts must take great caution when blazing new state-law trails."). Moreover, even if I were to predict such a development of state law, I would still have to consider whether I should affirm the decision of the BSEA Hearing Officer on the ground that it was a sound decision, on the discretionary grounds stated above, even if not reasoned entirely correctly. And I affirm the decision on this ground.

For these reasons, I deny plaintiffs' claim for relief grounded on the contention that the School Committee did not implement Gershon's IEPs *between November 1992 and September 1994.*

## IX. Claim of "Nonimplementation" of IEPs for the Period September 1994 – August 1995

### A. Standard

■ This claim is one of "nonimplementation" and is not a claim that the IEPs for this period were "inappropriate." A claim alleging a failure to implement or noncompliance with an appropriately developed and formulated IEP is distinct from a claim alleging that an IEP was "inappropriate" under the standards identified in *Rowley*.

■ This court has jurisdiction over a claim of "noncompliance" or "nonimplementation" that was originally brought before the Hearing Officer. The scope of this court's jurisdiction under the plain language of the IDEA is broad. Any "aggrieved party" may file a civil suit in this court challenging, under 20 U.S.C. § 1415(e)(2), a decision of a state educational agency under 20 U.S.C. § 1415(b) or (c). Under 20 U.S.C. § 1415(b) and (c), the state educational agency is authorized to decide "[c]omplaints with respect to any matter relating to the identification, evaluation, or educational placement of the child or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(1)(E); 20 U.S.C. § 1415(b)(2); 20 U.S.C. § 1415(c). For these reasons, I conclude that this court has subject-matter jurisdiction to hear a challenge to the Hearing Officer's determination that the school district did "implement" Gershon's IEPs for the period September 1994 to August 1995.

■ Under the IDEA, a child who is eligible for special education because of a disability is to be provided a FAPE that includes special education *and* related services. *See* 20 U.S.C. § 1401(a)(18). A group of individuals (sometimes referred to as "TEAM") that includes teachers, experts, and the parent/s or guardian/s of the child are required to develop periodically an IEP for each child. The IEP identifies the special education and related services

that the student needs in order to receive a FAPE. 34 C.F.R. §§ 300.340–350. At a minimum, under the IDEA and federal regulations, a FAPE is an education that provides, at public expense, "personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." *Rowley,* 458 U.S. at 203, 102 S.Ct. 3034. In Massachusetts, lawmakers have chosen, under the authority of the IDEA, to raise that federal floor and define a FAPE as one that provides "maximum possible development of the child." *Roland M.,* 910 F.2d at 987. *See also* 20 U.S.C. § 1401(a)(18)(B) (FAPE "means special education and related services that meet the standards of the State educational agency").

After the TEAM has developed an IEP, the local educational agency and the State educational agency must provide special education and related services that are "in conformity with the individualized education program...." 20 U.S.C. § 1401(a)(18)(D); 34 C.F.R. § 300.340–50 (implement IEP). An IEP must be "implemented as soon as possible" after its development. 34 C.F.R. § 300.342(b)(2).

What constitutes being "implemented," however, is not precisely defined, and the determination of what constitutes being "implemented" is not rigorously confined by statutory, decisional or regulatory guidelines. This lack of detailed guidance neither comes as a surprise nor leaves the trial court an entirely free and unbound discretion.

Gershon's complaint arises from somewhat unusual circumstances. In Gershon's case, the ultimate determination by the Hearing Officer that the School Committee "did implement" Gershon's IEPs came after his last year of eligibility for educational benefits under the IDEA had ended.

Ordinarily, a student's parent, if dissatisfied with the level of "implementation" of or "compliance with" her son's or daughter's IEP, would raise that complaint at one of the periodic meetings contemplated under the IDEA and the regulations is-

sued thereunder. At these meetings, a group of individuals (sometimes referred to as "TEAM") is charged with revising an existing IEP or developing an entirely new IEP, as necessary, for the following period. In revising or developing the next applicable IEP, parents and experts would ordinarily address and attempt to remedy any identified deficiencies in the implementation of past IEPs. If they failed to do that, then the parent would have an opportunity to proceed to challenge, before a state administrative decisionmaker, the IEP as not "reasonably calculated to confer an educational benefit." Partly because of these dynamics, most disputes have required the decisionmaker to determine whether the IEP was, at the time it was developed (that is, in a common usage, "*ex ante*"), "reasonably calculated to confer an educational benefit," and not simply after the year has ended (in a common usage, "*ex post*"), whether the IEP was implemented and, in fact, conferred some educational benefit on the student.

In my view, defendants' submissions fail to take adequate account of the fact that a claim about implementation is necessarily distinct from a claim that an IEP was not appropriate at the time that it was adopted (that is, from the "*ex ante*" perspective). Defendants contend that this court should label plaintiffs' challenge as a "substantive" challenge, and that the court should examine *only,* under the "*ex ante*" standard in *Rowley,* whether the IEP was "reasonably calculated to confer an educational benefit," rather than considering for any purpose whether the IEP was actually implemented. But the fact that courts more frequently examine the appropriateness of an IEP rather than the implementation of an IEP does not support defendants' contentions that this court, in considering the Hearing Officer's decision and in making an independent review of the record before the court, must simply apply the second prong of *Rowley.*

Neither the Supreme Court nor the Court of Appeals for the First Circuit has had occasion to declare explicitly what standard an authorized decisionmaker must apply in deciding whether a school district did in fact "implement" an IEP.

The few decisions that address whether an IEP was "implemented" support the conclusion that a standard incorporating an *"ex. ante"* perspective is not appropriate.

One of the decisions most favorable to plaintiffs' contentions in this case is *County of San Diego v. California Special Educ. Hearing Office*, 93 F.3d 1458 (9th Cir.1996). In evaluating contentions closely analogous to the contentions of the parties now before this court, the Ninth Circuit opinion reasons:

> The County contends that the appropriate standard is whether placement was "reasonably calculated to provide the child with educational benefits.... The state agency's decision applied the correct standard: whether the placement implemented Rosalind's major IEP goals...."

> [T]he correct standard for measuring educational benefit under the IDEA is not merely whether the placement is "reasonably calculated to provide the child with educational benefits," but rather, whether the child *makes progress toward the goals set forth in her IEP.*

*Id.* at 1467–68 (citations omitted) (emphasis added) (citing *Rowley* in support: the placement must include "educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction," 458 U.S. at 189, 102 S.Ct. 3034).

In *Wall v. Mattituck–Cutchogue Sch. Dist.*, 945 F.Supp. 501 (E.D.N.Y.1996), the district court reviewed an administrative officer's decision that found against the plaintiff's contention that, although the IEP was appropriate, "the School District had improperly implemented the IEP by failing to use a specific reading instruction approach, the Orton–Gillingham method." *Id.* at 505. The court in *Wall* determined that the School District "had implemented" the IEP because the School District's efforts were "in fact producing educational benefits." 945 F.Supp. at 511. The court added the following reasoning:

> Michael's test scores show that he was making progress in several areas of study, including reading.... Although ... [the] instructional technique, specifically the absence of exclusive reliance on the Orton–Gillingham method, may not have met Wall's exact desires, accommodating a parent's ideal education program is beyond the scope of the IDEA.

*Id.* at 511–12.

In *Abney v. District of Columbia*, 849 F.2d 1491 (D.C.Cir.1988), the Court of Appeals for the District of Columbia stated that:

> [T]he complete failure to implement a child's IEP ... would undoubtedly ... result in a failure to provide the child with a free appropriate public education. This result obtains because the statute defines a "free appropriate public education" to include an educational program conforming to a child's IEP.

*Id.* at 1496 n. 3 (citing 20 U.S.C. § 1401(a)(18)). Finally, the court in *Lemon v. District of Columbia* declared, "the Court would be disturbed by allegations that DCPS does not implement the terms of approved and final IEPs for public school students." 920 F.Supp. 8, 11 (D.D.C.1996).

 As these decisions demonstrate, when presented with a claim that a school district failed to implement a student's IEP, a district court must determine whether the alleged failure to implement the IEP deprived the student of her entitlement to a "free appropriate public education," as defined under the applicable federal and state prescriptions.

These and other cases on which plaintiffs rely to fashion a theory of quite circumscribed discretion of the federal trial court in making an evaluative determination about "implementation," or in judicially reviewing particular findings of historical fact, do have nuances favorable to plaintiffs, and they provide substantial support for the following guidelines about these evaluative determinations: (1) the "failure" to implement must not be a "complete" failure (2) the variance from the special education and related services specified in the IEP must not deprive the student of a FAPE, and (3) the provision of special education and related services must make "progress" toward the achievement of the goals stated in the IEP. Each of these guidelines, in turn, in application often requires subsidiary evaluative determinations. *See Roland M.,* 910 F.2d at 990. Nevertheless, the absence of bright-line rules in this context is compatible with the deference to an expert decisionmaker that governs a district court's determinations under the IDEA. *See id.* at 989.

## B. Goals, Special Education, and Related Services in the IEPs

As of September 1994, Gershon's IEP was not one discrete document, but rather a compilation of various documents. All of these documents are in the record now before this court. Record, Exhs. S1–S12, P1–P7. During the period between September 1994 and August 1995, this compilation continued to be amended and modified with new proposed IEPs and amendments to them.

The parties in their submissions in support and in opposition to the motion for summary judgment do not directly dispute the prescription of goals. In common, the parties support special education and support the provision of services that those documents in totality set forth. Defendants nevertheless seek affirmance of all of the Hearing officer's findings, and plaintiffs' challenge is centered on whether the prescriptions in these documents were in fact implemented by the School Committee.

In light of the record and the contentions of the parties before this court, the following events relevant to plaintiffs' claim of nonimplementation appear not to be in dispute before this court:

*March 30, 1994.* At a pre-hearing conference in a previous action before the BSEA, the Hearing Officer directed the local educational agency to compile into one document all previous BSEA decisions and IEP documents that plaintiffs had previously accepted. This compilation of documents stands as the last agreed-upon placement between the parties. *See* Record at 462. This compilation, 54 pages in total, assessed performance levels as of August 1992, and prescribed "general student centered goals" and "teaching approach[es] and methodology[,] monitoring and evaluation techniques[,] specialized equipment[,] and materials" for achieving each goal. Record at 480–94. The compilation identified five sets of general goals for Gershon:

(1) "decrease obsessive compulsive behaviors" through a "comprehensive neurobehavioral program to be developed through consultant Dr. Luiselli," with specific goals to be "developed by consultant and reviewed by the team." Record at 480;

(2) participation in "structured activities within the Keefe high school and the community to increase social skill development and interpersonal communication" through development of scripts, "learn by doing language experience base," computer use, and use of "Ideal System." Record at 482–85.

(3) "improve his ability to initiate and respond to conversations with increasing independence" through mainstreaming in "Office Occupations/Jet Exploration, Physical Education and Computer Lab," Record at 486.

(4) "increase his skills/knowledge and levels of activity in all listed [academic] objectives," including computer use, keeping of notebook and close monitoring, Record at 488–90,

(5) "become familiar with the community" and "maintain a volunteer and/or paid job," through one-to-one guidance by a facilitator and with close monitoring, Record at 491–94.

For each of these general goals and methodologies, the compilation then itemizes a series of "specific student centered objectives." Record at 496–511. These more specific objectives total around seventy. *Id.* All of these goals and objectives were from the 12/92 to 12/93 IEP, but they remained as the applicable educational prescriptions by order of the Hearing officer in a previous action before the BSEA in the absence of other agreement.

Also in existence, as of March 30, 1994, was a draft IEP for 12/93 to 12/94, which resulted from a November 8, 1993 meeting, but plaintiffs had not agreed to it. Record at 129–172. The 12/93 to 12/94 IEP included the following general goals and methodologies:

(1) "increase ability to problem solve and improve processing skills" through "dual keyboarding, menus, script rehearsal, schedules, experience stories, 1:1 and small group 'Circle of Friends' . . .," computer use and monitoring, Record at 138;

(2) increase use of "pragmatic language relevant to social situations" through same methods as in (1), Record at 139;

(3) "increase social skill development and interpersonal communication," Record at 139;

(4) "interact effectively and enjoy his surroundings," through "verbal prompts, core lists, start up language, [and] circle of friends . . . ." Record at 141;

(5) academic objectives as in previous compilation described immediately above, Record at 143–45;

(6) familiarize with transition plans [out of IDEA-supported programs] with help of facilitator, Record at 147–49;

(7) "improve sensory modulation of touch, movement and . . . (muscle-joint position sense)" through a "sensory integrative treatment approach," Record at 150;

(8) "improve postural control and stability to enhance gross motor planning skills" through a "cognitive/adaptive based approach," *id.;*

(9) "improve independence in functional performance and daily living skills" through same as in (8), *id.;*

(10) "develop a plan designed to decrease the obsessive compulsive behaviors that are observed in the environment and interfere with his daily functioning and ability to progress" by Dr. Luiselli, Record at 152.

Goal (10) was based on assessed levels of performance on November 1993 that indicated that Gershon was engaging in such activities as "excessive hand washing" and asking people not to touch him. Record at 152–54. Some numbering discrepancies exist in this IEP as eleven assessments of performance are numbered, but only ten general goals are articulated. The IEP also lists 64 specific goals. Record at 155–172.

*March 31, 1994.* The School Committee proposes a First Amendment to the 12/93 to 12/94 IEP. This Amendment resulted from a meeting on March 18, 1994. The Amendment suggests clinical consultation services by Dr. Michael Dorsey with respect to the assessed obsessive compulsive behavior described in the 12/93 to 12/94 IEP. The Amendment requests the parent's approval of Gershon's IEP and the Amendment. Record at 173–83.

*April 12 and April 22, 1994.* Letters by Ms. Ross and her attorney largely (even if not totally) consent to the First

Amendment to the 1993/94 IEP. Record at 184–88.

*May 6, 1994.* The TEAM proposes a Second Amendment to the 12/93 to 12/94 IEP. The amendment responds to inquiries by Ms. Ross about Gershon's programs for the summer of 1994. Record at 189–98.

*May 12, 1994.* Ms. Ross partially consents to Second Amendment. Record at 199.

*May 15, 1994.* Ms. Ross writes a letter to the School Committee stating: "This is to inform you that I reject Gershon's Individualized Education Plan (IEP)." Record at 201.

*May 15, 1994 – January 26, 1995.* The School Committee does not propose any new IEP for Gershon. It is unclear, on the record before this court, whether the compilation based on the 12/92 to 12/93 IEP or the 12/93 to 12/94 IEP, or both, prescribed the applicable educational goals and methodologies for this period. The Hearing Officer found that it was the former and not the latter. Record at 11 (Finding No. 51).

*January 26, 1995.* The TEAM proposes a new IEP for the period 2/95 to 8/95. Record at 544–80. The IEP prescribes the following general goals and methodologies:

(1) "participate in structured activities . . . with diminishing amount of facilitator intervention" through substantially same methods as in previous proposed IEPs, Record at 544;

(2) "improve pragmatic language skills" through substantially same methods as in previous proposed IEPs, *id.;*

(3) "improve receptive and expressive communication skills" by developing "grid of interactions," Record at 545;

(4) continue work at Blockbuster Video with monitoring, Record at 547;

(5) "continue to increase inclusion in mainstream vocational activities with decreasing assistance of the facilitator," *id.;*

(6) "continue to increase his facility on the computer," *id.;*

(7) "will explore activities of interest" while facilitator keeps "birdseye view," Record at 552;

(8) increase academic knowledge, Record at 556;

(9) "improve sensory modulation and sensory processing skills" through a "sensory integrative treatment approach," Record at 560;

(10) "improve motor planning skills," Record at 561;

(11) "improve adaptive coping behaviors and development of effective leisure, ADL, and work skills," Record at 562.

Notably, the proposed 2/95 to 8/95 IEP did not assess obsessive compulsive behavior as the previous proposed IEPs did. It did propose 47 specific goals. One of these specific goals was:

(27) Gershon will audit a course at Mass Bay College or other educational institution with facilitator assistance to complete assignments, listen and participate in class independently 4 out of 5 consecutive class sessions. Record at 571.

*February 1, 1995.* Ms. Ross sends her response to the proposed 2/95 to 8/95 IEP. The response (1) "accepts the goals and objectives under occupational Therapy", and (2) postpones decision on all other aspects of the proposed IEP because she disagrees "with all the other assessments and the resulting IEP." Record at 581.

*March 10, 1995.* The TEAM proposes a First Amendment to the 2/95 to 8/95 IEP. The First Amendment adds a "Health Curriculum to the IEP. A new goal no. 12 is added that addresses instruction on the subjects of 'body systems[,] human development[,] self-awareness[,] basic emergency procedures[,] and sexuality.'" Record at 586.

*March 11, 1995 – May 10, 1995.* Further revisions of First Amendment take place and Ms. Ross finally consents to First Amendment as revised.

*May 11, 1995.* Framingham Public Schools seeks approval of parents to seek transitional job development for Gershon, as provided in the 2/95 to 8/95 IEP, with Metro West Mental Health, and to send relevant records to that entity.

*May 16, 1995.* The TEAM proposes a Second Amendment to the 2/95 to 8/95 IEP. This Second Amendment identifies Metro West as the transitional development provider and confirms arrangements to allow Gershon to attend Mass Bay Community College.

*June 11, 1995.* Ms. Ross accepts Second Amendment.

*June 12, 1995 – August 30, 1995.* The parties have not alleged that any facts material to the nonimplementation claim took place during this period.

## C. Shortcomings Alleged by Plaintiffs

Plaintiffs contend that defendants did not provide Gershon with the following four educational or related services that were specified in the IEP: (1) defendants did not provide visual aids as part of language materials in achieving the language-related general goals described above, (2) defendants did not forward enough of Gershon's records to Metro West to allow them to continue his education after August 1995, (3) defendants did not provide Gershon with consultation services by Dr. Michael Dorsey, (4) defendants did not provide Gershon with adequate treatment for obsessive compulsive behavior under the applicable IEPs, and (5) defendants did not enroll Gershon at Mass Bay Community College.

With respect to (1), plaintiffs point to the testimony of Dr. Barbara Cutler as support for their contention that the language education provided did not meet the goals specified in the IEP. With respect to (2), plaintiffs contend that the Hearing Officer incorrectly excluded testimony that showed that Metro West asked the School Committee after August 1995 to forward to Metro West the record, and ask this court to infer that Gershon's record was not forwarded to Metro West until after August 1995. With respect to (3), (4), and (5), plaintiffs ask this court to reach, on its independent review, a determination contrary to the Hearing Officer's determinations.

Plaintiffs contend that the evidence they have presented, if credited, could reasonably support findings of historical fact, favorable to them, that, in turn, they contend would support an evaluative determination that Gershon's IEP was "not implemented." For these reasons, plaintiffs argue that a genuine dispute of material fact exists in the case.

## D. Findings and Evaluative Determinations of the Hearing officer

### 1. Language Materials

The Hearing Officer made the following findings with respect to the language instruction offered to Gershon for the period September 1994 to August 1995 under his IEPs:

43. From September 1994 through August 199[5] Framingham provided language materials for Gershon as per the Student's IEP (See SE–42; Testimony of Judith Vaillancourt, Ann Villani, Kathleen Kohland–Park).

44. The language materials used by Framingham were both appropriate and effective to meet Gershon's needs. (Testimony of Judith Vaillancourt, Ann Villani and Kathleen Kohland–Park).

45. Ms. Villani and Ms. Kohland–Park used the following procedure in the development of language materials: identifying words from various settings, defining the words, using them in sentences, preparing scripts on the computer, placing scripts in Gershon's notebook, organized by activity using a color coded

format. (Testimony of Ms. Villani and Ms. Kohland–Park).

Plaintiffs have proffered evidence in the March 1, 1999 Plaintiffs' Additional Exhibits that indicates that Gershon's language and social skills are currently deficient and could benefit from further instruction. *See, e.g.*, March 31, 1999 filing at P52. Furthermore, plaintiffs have proffered evidence that indicates that Gershon is not currently successful in the employment realm. *See, e.g., id.* at P58–P60.

This evidence does not persuade the court that the BSEA's findings on this subject (# 43–45) are in error. First, the fact that a student, at the end of his education, has not fully mastered a skill does not necessarily indicate that he did not achieve *progress* in that area. Second, ample other evidence in the record supports the findings. For example, the evidence indicates that voluminous material was prepared as language aides for Gershon, including scripts of conversations that he might expect to have in his social life and in his job, and also including conversations he had with people on the computer which he then would print out. *See, e.g.*, Hearing Transcript, Vol. III, pp. 136–139; Hearing Transcript, Vol. IV, pp. 126, 139, 148–151; Hearing Transcript, Vol. VI, pp. 61–74; Record at 1155–1289, 1303–73. Testimony was given that the language materials used with Gershon included visual components. *See* Hearing Transcript, Vol. VI, p. 84. Indeed, testimony is in the record that the language materials were "being used effectively," and that "Gershon was able to make good use of them." *See id.* at 88, 93. Based upon the evidence mentioned here, which is only a representative sample of the ample support in the record for the BSEA's findings, I conclude that plaintiffs have not met their burden of proving that the BSEA's findings should not be credited.

## 2. Metro West

This matter appears in the IEP history at the date May 11, 1995. *See also* Part VIII.C (p. 37–38), above, indicating that the core of plaintiffs' claim of nonimplementation is delay in the School Committee's response to Metro West's request for Gershon's record. I find this not to be an adequate basis for challenge. Plaintiffs argue in effect that failure to respond before August 1995 established a right to the remedy they seek without any proffer of evidence that would support findings that in fact the School Committee was at fault in some way rather than simply taking the time reasonably needed to compile and check for accuracy the complete and lengthy record requested. I conclude that this challenge cannot be sustained.

## 3. Neurobehavioral Goals

Plaintiffs' March 1, 1999 statement calls attention to the February 10, 1994 letter to the School from plaintiff parent on this subject. Docket No. 60 at 9.

Defendants' Supplemental Memorandum (Docket No. 63) calls attention to other documents in the record that bear upon this matter:

> The so-called neuro-behavioral plan is set forth as Goal 1 on page 20 of the Last Agreed Upon Placement of March 30, 1994 (Exhibit S–1, A.R. 460, at A.R. 480). It is also included as Goal 11 in the 12/93–12/94 IEP (Exhibit P–1, A.R. 123 at A.R. 152). Although the Plaintiffs never accepted the Exhibit P–1 in whole, she did purport to accept the First Amendment (Exhibit P–2, A.R. 173) which included that Dr. Michael Dorsey would provide consultation services to implement Goal 11 of the 12/93–12/94 IEP (Exhibit P–1). Goal 11 of Exhibit P–1 is the same so called neuro-behavioral plan as Goal 1 in Exhibit S–1. For the purposes of this discussion it is probably immaterial whether the so-called neuro-behavioral plan at issue is Goal 1 from Exhibit S–1 or Goal 11 from Exhibit P–1.

Docket No. 63 at page 10.

The Hearing officer found as follows:

52. The goal for the neuro-behavioral plan was derived from the information which came from an August 1992 consultation. (Testimony of Mr. R.) The basis for this recommendation was a concern over the possible "risk" of Gershon's developing obsessive compulsive behaviors. (*Id.*)

53. By September 1994 Gershon did not present, nor had he been diagnosed with obsessive compulsive disorder. He also did not manifest obsessive compulsive behaviors which "interfere[d] with his daily functioning and ability to progress". Gershon did not suffer from any phobic disorder either. (Testimony of Dr. Dorsey) According to Dr. Dorsey, by September 1994 none of the behaviors for which the neuro-behavioral plan was designed, were evident or interfering with Gershon's functioning.

54. The service providers were twice asked to keep a record of Gershon's behaviors for several weeks. The records compiled were reviewed by Dr. Dorsey, and used in conjunction to his own observations of Gershon, and review of the student's extensive file, to reach his conclusion and make recommendations. (Testimony of Dr. Dorsey) Dr. Dorsey testified that the neuro-behavioral plan was not appropriate for Gershon because: (1) the behavior plan then currently in place was effective in reducing undesirable behaviors, (2) a more rigorous behavior plan presented its own risks, as well as being invasive to Gershon and (3) such a plan may not be effective in the reduction of low frequency behaviors. Dr. Dorsey recommended that not neuro-behavioral plan be put in place for Gershon. (Testimony of Dr. Dorsey)

Record at page 11.

I conclude that the evidence in the administrative record amply supports the findings of the BSEA. The testimony of Dr. Dorsey is consistent with that which was attributed to him by the BSEA: that he "was called in to do this what was called

a neurobehavioral plan." Hearing Transcript, Vol. V, pp. 177–78. His testimony indicates that he examined data collected about Gershon, *see id.* at 180, and determined that "it would not be appropriate to enter into any kind of intensive treatment procedure to try to further reduce those behaviors." *See id.* at 181. Furthermore, Dr. Cutler testified that Gershon did not have an obsessive compulsive disorder and would not need a plan designed to eliminate such a disorder. *See* Hearing Transcript Vol. III, Docket No. 54, pp. 203–204. Based upon this and like evidence, I determine that the findings of the BSEA that the IEP was properly implemented with respect to the "neuro-behavioral plan" were amply supported and should be credited.

### 4. Alleged Failure to Enroll Gershon in College Course

Plaintiffs argued in the BSEA proceeding that Gershon's IEP obligated defendants to enroll Gershon in a college course at Mass Bay Community College, which defendants failed to do.

The Hearing Officer made the following findings of fact:

57. The goal and objectives addressing enrollment and participation in a post-secondary education course for Gershon were accepted by the Parent on January 11, 1995. The acceptance came after the second session of a TEAM meeting initiated on December 16, 1994 and completed in January 1995. The goal and objectives appeared in the third amendment to the IEP dated December 1993 to December 1994, covering the period 1/9/1995 through 1/31/1995. (SE 3).

58. In December of 1994, Ms. Villani acquired a catalog for courses at Mass. Bay Community College (hereinafter, "MBCC"). A course was selected for and by Gershon, but was found to be not appropriate because it was lecture based. (Testimony of Ms. Villani).

59. Gershon and Ms. Villani continued to work through February, March and

April on identifying an appropriate course, visiting the campus, attending two meetings at MBCC, changing Gershon's schedule so that he could partake in the Spring session, looking over the curriculum, reviewing the text-book for the class, etc. Another course was selected for and by Gershon was enrolled. (SE–37). Ms. Villani, Gershon and another student attended the first day of class but the class was cancelled due to lack of enrollment. (Testimony of Ms. Villani)

60. The goal and objectives at issue were not simply the taking of a class at MBCC. The entire process was part of the goal and objectives, including selecting the class, working out the schedule and the enrollment process. (SE–2; testimony of Ms. Villani) 61. Of the five objectives, the first three (6–1 to 6–3), were actually accomplished. (SE–2; Testimony of Ms. Villani)

The Hearing Officer made the following ruling of law on the subject:

The testimony and exhibits presented warrant a finding that Framingham did everything within its power to enroll Gershon in a course at MBCC, and that Gershon achieved at least some of the objectives in this goal. The goal and objectives at issue were not simply the taking of a class at MBCC. (See SE–2) The entire process of exploring post-secondary educational opportunities was part of the goal and objectives.... Gershon was enrolled and he attended the first session. On that day he and Framingham were notified that the course had been cancelled. (Testimony of Ms. Villani) Ms Villani also attempted to identify appropriate courses elsewhere (i.e. at the Museum of Science) unsuccessfully.... Where as in here three fifth of the objectives were implemented and achieved successfully, and the rest were attempted but not achieved due to circumstances beyond the district's control, it would be inequitable to penalize the school. Thus the evidence supports

Framingham's position that it acted in good faith and that it did not violate the IEP.

Record at 18–19.

The evidence cited in the parentheticals of the above-quoted findings of fact and law support the BSEA's findings. Plaintiffs have not proffered evidence or pointed to evidence in the record sufficient to raise a genuine dispute about the accuracy of the factual findings. Furthermore, plaintiffs have not persuaded the court that the BSEA's findings of law with respect to this issue were in error. Therefore, I determine that the BSEA's findings of fact and law on this issue deserve deference.

**5. Evaluative Determination of "Compliance" or "Implementation"**

Plaintiffs argue that the court should in this case make an evaluative determination of the merits of claims regarding compliance and implementation in the two earlier proceedings and, upon that basis, override the Hearing Officer's decision under review in this case. I conclude that this contention fails for lack of close enough relationships to issues properly before the court in this case.

**E. This Court's Independent, Yet Duly Deferential Review**

**1. No "Complete Failure"**

Plaintiffs' contention that the School Committee's performance should be characterized by this court as a "complete failure" to implement the IEPs for the September 1994–August 1995 period is not supported by the record before this court. The findings as to facts not genuinely in dispute and the conclusions explained in Parts VIII.C and VIII.D above explain why I reach this conclusion as a matter of law.

**2. Progress Toward Goals**

Plaintiffs' contention that Gershon was not making progress toward the goals of the IEPs for the period September 1994–August 1995 also is not supported by the

record for the reasons explained in Part VIII.C and VIII.D above. I so conclude as a matter of law.

### 3. FAPE

The recent opinion in *Kathleen M.*, in an introductory section of the opinion under the caption "OVERVIEW," sets the framework for this court's consideration of plaintiffs' contentions regarding the FAPE:

The IDEA was enacted to ensure that all children with disabilities receive a "free appropriate public education [FAPE] ... designed to meet their unique needs." 20 U.S.C. § 1400(c). "While a state may not depart downward from the minimum level of appropriateness mandated under federal law, 'a state is free to exceed, both substantively and procedurally, the protection and services to be provided to its disabled children.'" *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 987 (1st Cir. 1990) (quoting *Burlington v. Department of Educ.*, 736 F.2d 773, 784–85 (1st Cir.1984) ("Burlington II")). Massachusetts has chosen a higher standard: The Department of Education is required to administer programs that "'assure the maximum possible development of a child with special needs.'" *Stock v. Massachusetts Hosp. Sch.*, 392 Mass. 205, 211, 467 N.E.2d 448, 453 (1984) (quoting Mass.Gen.Laws ch. 71B § 2); *see also Roland M.*, 910 F.2d at 987; *David D. v. Dartmouth Sch. Comm.*, 775 F.2d 411, 423 (1st Cir.1985).

The FAPE is implemented through an individual education plan (IEP), a written statement that sets out an educational program to meet the particularized needs of a child with disabilities. 20 U.S.C. § 1301(a)(20). In Massachusetts, an IEP for a child is developed by TEAM, a group of individuals including "the parents, the child's teacher, designated specialists, and a representative of the [local education agency]." *Roland M.*, 910 F.2d at 988. The IEP must be reviewed annually and revised when necessary. *See id.*

Parents who are dissatisfied with their child's IEP can present a complaint and obtain a due process hearing to resolve the problem. *See* 20 U.S.C. § 1415(b)(1)(E) & (2). In Massachusetts, this function is performed by the BSEA. *See Roland M.*, 910 F.2d at 987. During the pendency of proceedings under § 1415, the child is to "remain in the then current educational placement." 20 U.S.C. § 1415(e)(3). If the school district cannot provide the FAPE itself, it can recommend that the child be placed in a private facility at no cost to the parents. *See* 34 C.F.R. 300.401(a)(2). However, parents who "'unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials,' ... are entitled to reimbursement only if ... the public placement violated IDEA and [ ] the private school placement was proper under the Act." *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 15, 114 S.Ct. 361, 366, 126 L.Ed.2d 284 (1993) (quoting *School Comm. v. Department of Educ.*, 471 U.S. 359, 373–74, 105 S.Ct. 1996, 2004–05, 85 L.Ed.2d 385 (1985)).

Judicial review of the decision of the BSEA presents a two-fold inquiry: Whether the state has complied with the procedures of the Act, and whether the IEP developed through those procedures is "reasonably calculated to enable the child to receive educational benefits." *Board of Educ. v. Rowley*, 458 U.S. 176, 206–07, 102 S.Ct. 3034, 3051, 73 L.Ed.2d 690 (1982). The Act imposes procedural requirements upon state and local education agencies to "assure that children with disabilities and their parents ... are guaranteed procedural safeguards with respect to the provision of free appropriate public education." 20 U.S.C. § 1415(a). "The primary safeguard is the obligatory development of an individual education program (IEP)." *Roland M.*, 910 F.2d at 987 (citing *Rowley*, 458 U.S. at 181, 102 S.Ct. 3034).

The IEP must contain "statements about the child's current performance, long-term and short-term instructional targets, and objective criteria for measuring the student's advance." *Id.* (Citing 20 U.S.C. § 1401(19) and 34 C.F.R. § 300.346); *see also Rowley,* 458 U.S. at 206 n. 27, 102 S.Ct. 3034. And, as noted, a school's programs must "assure the maximum possible development of a child with special needs," subject to the Act's preference for "mainstreaming," i.e., educating handicapped children and non-handicapped children together "to the maximum extent appropriate" and providing special education in "the least restrictive environment." *Id.* (citing 20 U.S.C. § 1412(5) and 34 C.F.R. § 300.552(d)).

154 F.3d 8, 10–11.

The following points stated in this "OVERVIEW" are especially relevant in the present case:

(1) A state is free, by legislation or administrative action, to impose on state and local officials requirements that exceed, both substantively and procedurally, the requirements imposed on them by federal law for the protection and services to be provided to disabled children in the state, to enable those children to receive a "free appropriate public education [FAPE]."

(2) Massachusetts has, by legislation and administrative action, imposed on state and local officials, requirements that exceed, both substantively and procedurally, the requirements imposed on them by federal law.

(3) The FAPE for a particular child is implemented through an individual education plan (IEP), a written statement that sets out an education program to meet the particularized needs of that child. Each IEP is developed by TEAM, a group of individuals including "the parents, the child's teacher, designated specialists, and a representative of the [local education agency]."

(4) Parents who are dissatisfied with the IEP developed by TEAM may present a complaint to BSEA and obtain a due process hearing before a Hearing Officer designated by BSEA.

(5) The BSEA Hearing Officer's decision is subject to judicial review.

(6) If the IEP calls for public placement, parents who "unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local officials ... are entitled to reimbursement only if ... [a] the public placement violated IDEA and [b] the private school placement was proper under the federal Act."

(7) Judicial review of the BSEA decision (including a decision of the BSEA hearing Officer that BSEA allows to stand) presents a two-fold inquiry: (q) Whether the state has complied with the procedure of the federal Act, and (b) whether the IEP is "reasonably calculated to enable the child to receive education benefits."

(8) The primary procedural safeguard "is the obligatory development of an individualized education program (IEP)."

(9) If the IEP authorizes placement in a public school, that school's programs must "assure the maximum possible development of the child with special needs," subject to the federal Act's preference for "mainstreaming"—that is, (a) educating handicapped children and non-handicapped children together "to the maximum extent appropriate," and (b) providing special education in "the least restrictive environment."

Plaintiffs have attempted, unsuccessfully, in their submissions to persuade this court to add more requirements to these nine requirements approved by the opinion in *Kathleen H.* For example, plaintiffs indicate in their submissions that failure by Gershon to achieve success in meeting all of the goals in his IEP is conclusive evidence of nonimplementation. *See, e.g.,* Docket No. 60, p. 20 (attributing Gershon's loss of his job at Blockbuster Videos "to

the school's neglect to expand the tasks Gershon could do if provided instruction through the mode of required language development methods of the IEP which would then have produced for written instruction for new job tasks."). Plaintiffs have not persuaded the court that the IDEA requires complete realization of all of the goals in the IEP, even under the stricter standards of Massachusetts law.

In short, the BSEA found that the services provided to Gershon by defendant Framingham School Committee "were adequate to fulfill their responsibilities to Gershon under State and Federal law," implementing an undisputedly appropriate IEP. Record at 16. The submissions before this court amply support that conclusion; plaintiffs have not borne their burden of proof that the BSEA was in error and I determine that the BSEA was not in error. The services offered to Gershon met the requirements of a FAPE, as enumerated above.

## X. Plaintiffs' Fifth Contention: The Federal Monitoring Reports

Plaintiffs contend that the record now before the court is inadequate because it does not include certain Federal Monitoring Reports that were before the Hearing Officer. These Reports are allegedly prepared by a federal agency and allegedly document the MDE's IEP "implementation" practices.

 In plaintiffs' description of these Reports, they have not contended that the Reports describe any acts or events that might be relevant to any decisive issues before this court. In the circumstance of record before me in this case, as an evidentiary ruling I conclude that evidence of custom or practice by the school district of not implementing the IEPs of disabled students in the school district is not admissible and cannot reasonably support a determination that Gershon's IEPs were not implemented.

## XI. Plaintiffs' Seventh Contention: Undue Expense to Various Agencies of the Commonwealth of Massachusetts

In the claim that this court has identified as plaintiffs' Seventh Contention, plaintiffs allege that the actions (including failure to act when a duty to act existed) of the Framingham School District, the Town of Framingham and the Massachusetts Department of Education, amounting to failure to implement Gershon's IEP, have caused an undue financial burden on other subdivisions of the Commonwealth of Massachusetts and on Massachusetts tax payers.

 I find that plaintiffs have no standing to assert a claim of this type in the circumstances of record in this case. In addition, plaintiffs have failed to make even a prima facie showing that this court has subject-matter jurisdiction over such a claim, or that a factually sufficient basis exists for a successful claim if jurisdiction were established.

For these reasons, I conclude that plaintiffs have failed to assert, in their Seventh Contention, a claim upon which this court could grant relief, and that defendants are entitled, as a matter of law, to summary judgment against claims based on Plaintiffs' Seventh Contention.

### ORDER

For the foregoing reasons, it is ORDERED:

(1) Defendants' Motions for Summary Judgment (Docket Nos. 27 and 33) are ALLOWED.

(2) The Clerk is directed to enter forthwith on a separate document a Final Judgment as follows:

For the reasons stated in the Opinion of April 21, 1999, it is ORDERED:

Judgment for defendants.